**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


COOK TECHNOLOGIES, INC.          :
EMPLOYEE STOCK OWNERSHIP PLAN,:
COOK TECHNOLOGIES, INC., as    : CIVIL ACTION
the Plan's Administrator,       :
COOK TECHNOLOGIES, INC.,        :
EMPLOYEE STOCK OWNERSHIP        :
PLAN TRUST, MICHAEL FINNEGAN  : NO. 15-CV-1028
as a plan participant           :
                                :
          Plaintiffs            :
                                :
          vs.                   :
                                :
THOMAS A. PANZARELLA            :
                                :
          Defendant             :
_____
THOMAS A. PANZARELLA, SR.       :
                                :
          Plaintiff             :   CIVIL ACTION
                                :
                                :
          vs.                   :
                                :   NO. 15-CV-3568
COOK TECHNOLOGIES, INC.,        :
et. al.                         :
                                :
          Defendants            :



**DECISION**


**JOYNER, J.**                                    **December 17, 2018**


      These competing civil ERISA actions were tried non-jury

before the undersigned over a total of eight days from April 9 -

13, 2018 and April 30 - May 2, 2018.  The parties have since

filed their proposed findings of fact and conclusions of law and

supplemental post-trial briefing and the matter is now ripe for adjudication by the Court. Accordingly, we hereby make the following:

## **FINDINGS OF FACT**

1. Thomas A. Panzarella, Sr. is an adult individual presently residing at 413 99th Street, Stone Harbor, NJ 08247.

2. Cook Technologies, Inc. was incorporated in 1946 in Pennsylvania and remains a Pennsylvania corporation with a principal place of business located at 1 North Second Street, Green Lane, Pennsylvania 18054. (P-26, p. 6).

3. Cook Technologies, Inc. ("Cook" or "Cook Technologies") is the plan administrator and plan sponsor of the Cook Technologies, Inc. Employee Stock Ownership Plan ("Cook ESOP"). Cook Technologies, Inc. is also now the Trustee of the Cook ESOP. (N.T. 4/10/18, pp. 177-178).

4. The Cook ESOP was created in 1974 and is an employee pension benefit plan within the meaning of the Employee Retirement Income Security Act, 29 U.S.C. §1002(d) ("ERISA"). (P-26, p. 6; N.T. 5/1/18, pp. 181-182).

5. Michael Finnegan, Gordon Kulp and Robert Ziegler are adult individuals presently residing in the Commonwealth of Pennsylvania and are directors of Cook Technologies, Inc. Immediately prior to Cook Technologies becoming Plan Trustee, Messrs. Finnegan, Kulp and Ziegler were the Trustees and

fiduciaries of the Cook ESOP and the Cook ESOP Trust. (N.T. 4/10/18, p. 178). Prior to that and in February - May, 2012, Mr. Ziegler, Mr. Panzarella and Mr. Finnegan were Trustees and fiduciaries of the Cook ESOP and the Cook ESOP Trust. (Exhibit P-2).

6. Cook Technologies, Inc. ("Cook") provides engineering, consulting and design services for sample prototypes and manufactures parts, subassemblies and complete metal-based products according to its customers' specifications. Among its most frequently-produced products are computer and copier trays, steel cabinets, chair frames, automotive stampings and items used in the health care industry. (N.T. 4/10/18, pp. 174-177; P-26, p.6).

7. Michael Finnegan, Gordon Kulp and Robert Ziegler are all long-term employees of Cook Technologies. Mr. Kulp has worked for Cook Technologies for some 34 years, starting as a punch press operator, working his way up to welder and into the prototype and tool rooms and eventually becoming the maintenance director and overseeing a division of Cook - Lehigh Valley Mobility.[1] Mr. Finnegan began working for Cook Technologies in February 1978, after having completed a four-year night school and apprenticeship program in Tool and Die and working for

---

[1] Lehigh Valley Mobility was established in February 2009 as a fictitious name which operated as a dealer for the mobility products developed and designed by Freedom Sciences and manufactured for Freedom Sciences by Cook Technologies. (N.T. 5/2/18, pp. 11-12; Panzarella Exhibit 86, p. 17).

General Electric for twelve years.  He was first employed as a
tool and die maker at Cook, and gradually moved into other
positions doing quoting/pricing, managing/supervising the tool
room and becoming the company estimator.  (N.T. 4/10/18, pp. 3-
11; N.T. 4/12/18, pp. 3-13).  Mr. Ziegler has been employed at
Cook for nearly 37 years, beginning as a machine operator and
later working as a materials handler, overseeing the receiving
department, and in quality control.  (N.T. 4/30/18, pp. 43-46).

8.  Thomas Panzarella, Sr. began working at Cook in
September, 1975.  (N.T. 4/12/18, p. 140; N.T. 5/1/18, p. 172).
Prior to that time, Mr. Panzarella had worked at General Electric
for some ten years, having entered GE's Tool and Die
Apprenticeship program in 1965 shortly after his high school
graduation.  While working for GE, Mr. Panzarella also attended
night school at Spring Garden College, Temple University and St.
Joseph University and eventually earned a Bachelor of Science
degree in Business Administration from St. Joseph's University in
1972 and a Bachelor of Science degree in Mechanical Engineering
from Spring Garden College in 1973.  (N.T. 4/12/18, pp. 127-132,
140; N.T. 5/1/18, p. 173).  His position at General Electric at
the time that he left its employment was that of an Engineer.
(N.T. 4/12/18, p. 136; N.T. 5/1/18, p. 173).

9.  Mr. Panzarella started working at Cook as the Plant
Manager under the direction of Donald and Charles Cook, the

company's President and Vice President, respectively.  At that time, the company had no proprietary products of its own, but rather did primarily metal fabrication, stamping and welding work to order and based upon whatever specifications a particular customer gave it.  In 1975, Cook was a small company doing approximately $1 million annually in business and employing only about 15 people.  (N.T. 4/12/18, pp. 144-145; N.T. 5/1/18, p. 174, 178-181).

10.  Thomas Panzarella's hiring in 1975 was part of a succession plan on the part of the company's then-owners, Donald and Charles Cook, who were specifically seeking someone who could move the company forward by introducing more modern technology and increasing sales and who would keep the company going as an employee-owned business that was empathetic to those within the organization who had lesser education. (N.T. 4/12/18, pp. 146-150; N.T. 5/1/18, pp. 175-176).  At the time Mr. Panzarella began working at Cook, the majority of the company was owned by its Employee Stock Ownership Plan ("ESOP").  (N.T. 5/1/18, p. 181).  As part of the succession plan, Mr. Panzarella was asked to put some money into the business and he therefore individually purchased shares of Cook stock outside of the ESOP, eventually acquiring an approximately 9% interest in the Company.  (N.T. 5/1/18, pp. 175-176).

11.  Mr. Panzarella became the Vice President of Cook in

1979 and was made President in 1981, when Charles Cook left the business.  Francis Undorfer became Cook's Vice President at or around that time, likewise personally acquiring some shares of Cook's stock "outside" of the ESOP.  (N.T. 4/30/18, pp. 43-45; N.T. 5/1/18, pp. 175-176).  Mr. Panzarella remained Cook's President until he retired in June, 2012.  (N.T. 4/12/18, pp. 158-159, 173).  Mr. Undorfer retired a few years before Mr. Panzarella, in or around 2006.  (N.T. 4/30/18, p. 48; P-83).  As of Mr. Undorfer's retirement, he and Mr. Panzarella were the only shareholders who held stock outside of the Cook ESOP.  (N.T. 5/1/18, p. 176).

12.  Between the late 1980's and late 1990's, Cook Technologies had as many as 150 employees and Mr. Panzarella's annual salary was upwards of $200,000, plus a company-paid car and expense account.  Like any manufacturing business, Cook did not have straight-line growth, but rather experienced ups and downs in its business and revenues depending upon what jobs would come in or were available to be bid on.  (N.T. 4/12/18, pp. 19-21, 153-158).

13.  In the early 2000s, Cook Technologies was producing certain products for a company called Electric Mobility, which was targeted to serving the mobility impaired/physically challenged consumer.  (N.T. 4/13/18, p. 73; N.T. 4/30/18, pp. 67-68; N.T. 5/1/18, pp. 238-239).  As part of this, Thomas

Panzarella helped develop a winch-mounted lift and some related devices which Cook produced and rigorously tested. Electric Mobility, however, was engaging in direct sales to primarily elderly consumers. Inasmuch as Cook had done the design work and testing and had much of the infrastructure for production in place, it began to produce and sell some of these products to dealers on its own under the fictitious name of "Freedom Lift." (N.T. 4/13/18, pp. 72-73; 4/30/18, pp. 68-69; N.T. 5/1/18, pp. 238-244).

14. At the National Mobility Equipment Dealers Association Conference in 2003 or 2004, Thomas Panzarella came up with an idea for what later came to be known as the Automated Transfer and Retrieval System or "ATRS." (N.T. 4/13/18, pp. 74-75; N.T. 5/1/18, pp. 139-140, 242).[2] Enlisting the help of Mr. Panzarella's son, Thomas Panzarella, Jr., to assist with writing software codes and overseeing the development of the technology and using an economic development grant, a prototype of this idea was manufactured at Cook Technologies and subsequently demonstrated to professors from Lehigh University, Carnegie Mellon University and the University of Pittsburgh. (N.T. 4/13/18, p. 74, 77; N.T. 5/1/18, pp. 129-130, 141-142, 243-245).

---

[2] The Automated Transport and Retrieval System (ATRS) was a robotic navigation system for a wheelchair. It enabled a wheelchair to self-navigate in the proximity of a motor vehicle and self-guide itself into a docking system. Then, after the mobility-impaired user was in the driver's seat of the vehicle, the system would independently stow the wheelchair away in the vehicle. (N.T. 5/1/18, pp. 130-131).

15.  To further develop the ATRS concept and to qualify for grant monies, Freedom Sciences, LLC was formed in or around July 2005 as a separate entity.  Cook Technologies had an exclusive manufacturing agreement with Freedom Sciences to produce anything that Freedom Sciences developed.  (N.T. 4/13/18, pp. 74-75; 5/1/18, pp. 129-130, 132-135; 5/2/18, pp. 4-5)).  Thomas Panzarella became the Chief Executive Officer ("CEO") of Freedom Sciences; concurrently he was and remained the CEO and President of Cook Technologies.  (N.T. 4/13/18, pp. 89-91, 129-130, 133).

16.  Although Cook Technologies in effect "incubated" Freedom Sciences insofar as it was Cook's location in Green Lane, Pennsylvania where many of the development team[3] meetings and some development work was performed and where the prototype was manufactured, most of the funding for the early stages of ATRS' development was provided through state and federal small business research and development grants.  (N.T. 5/1/18, pp. 132-136, 141-144, 149, 245-246).  In addition, throughout the initial development stages, a number of Cook employees collaborated with the development team of Freedom Sciences including Todd Bick, Bob Smith, Mike Kachalla, Gordon Kulp, Bob Ziegler, Scott Schiery, Mike Martin and Dan Zangrilli.  (N.T. 5/1/18, pp. 145-146).

---

[3]  The development team was primarily comprised of professors from Lehigh, Carnegie Mellon and University of Pittsburgh, Thomas Panzarella and his son, Thomas Panzarella, Jr., a computer programmer and scientist and internet engineer, and representatives from Invacare, a wheelchair company. (N.T. 5/1/18, pp. 128-133).

17.   Subsequently, Freedom Sciences began seeking private investors and through the Panzarellas' various presentations at venture fairs, trade shows and other venues, they eventually secured approximately a dozen outside investors for Freedom Sciences.  (N.T. 4/11/18, pp. 165-167; N.T. 4/13/18, pp. 77-85, 92-93; 5/1/18, pp. 134-137).  In or around February, 2006, Freedom Sciences secured office space at the Navy Yard in South Philadelphia.  (N.T. 4/30/18, pp. 68-70; N.T. 5/1/18, p. 145).

18.   Cook Technologies was the majority shareholder of Freedom Sciences, at first owning approximately 32-34% and eventually owning about 65%.  (N.T. 4/13/18, pp. 75-76, 97). Other shareholders included Thomas Panzarella (CEO) and Tom Panzarella, Jr. (Chief Technology Officer), Ira Hoffman, a friend of Tom Panzarella, Jr.'s from graduate school who assisted with developing the software for the robotics, Coby Johnson, an attorney with Cozen O'Connor, who became the operations manager and assisted with procuring additional investors, and a number of private investors such as Michelle and John Cunningham, who contributed some $500,000.  (N.T. 4/13/18, pp. 76-85, 90; N.T. 5/1/18, pp. 136-137; N.T. 5/2/18, p. 6; P-31, Exhibit "A"; P-62).

19.   Cook Technologies' investment in Freedom Sciences occurred largely through in-kind, non-cash contributions, the assumption of debt in the amount of $3.685 million and the purchase by Freedom Sciences of certain property and equipment,

inventory and intangible assets with a value of $552,000 for $5.5 million from Cook Technologies. (N.T. 4/11/18, pp. 138-148, 167-170, 177-179; N.T. 4/13/18, pp. 87-89; N.T. 5/1/18, pp. 147-150; N.T. 5/2/18, pp. 8-10; P-41; Panzarella Exhibit 86, pp. 16-17).

20. In or around 2006, Thomas Panzarella began thinking about his eventual retirement. (N.T. 5/1/18, pp. 193-194). To that end, he undertook the first of several attempts at succession planning by hiring Mike Kachalla, a global purchasing expert with an engineering degree who was also intended to replace Mr. Undorfer, the then soon-to-be-retiring Vice President.[4] (N.T. 5/1/18, p. 194). At the time of Mr. Kachalla's hire, Mr. Panzarella did not believe that any of the other people who were then working at Cook Technologies had the skill sets to succeed him. (N.T. 5/1/18, pp. 194-195). Although Mr. Kachalla worked at Cook for several years, he left Cook's employ without succeeding Mr. Panzarella as the Company's President/CEO. (N.T. 5/1/18, pp. 194-195).

21. At or around the same time that Mr. Kachalla was hired in 2006, Thomas Panzarella formed a "semi-formal management team" consisting of Mr. Ziegler, Mr. Kulp, and Mr. Undorfer, as well as Nancy Henry, Cook's controller and Scott Shiery, a Cook engineer. (N.T. 4/10/18, pp. 13-17, 23-24, 184-185; N.T. 4/30/18, pp. 49-52; N.T. 5/1/18, pp. 195-196). Initially, the team met on an as-

---

[4]   It appears that Mr. Undorfer retired in June 2006. (P-83).

needed basis and there also were scheduled quarterly meetings.
The roles of the management team members at this time did not
involve making any decisions with respect to the management of
the company, but the goal was largely to talk, exchange
information and understand what they were trying to accomplish as
a company. (N.T. 4/30/18, pp. 52-57, 64-65; 5/1/18, pp. 195-
196). The meetings became more formal in 2007-08 when minutes
began to be kept and, in conjunction with review of the quarterly
financial reports, discussions about sales prospects, and
potential equipment and personnel needs took place. (N.T.
4/13/18, pp. 115-119; N.T. 5/1/18, pp. 196-197).

22. In the course of collaboratively working with the
design group of Advent Design Corporation, Thomas Panzarella met
Bill Chesterson and Tom Lawton, that company's principals with
whom he began discussing his desire to retire. Mr. Panzarella
envisioned that the two principals of Advent would become the
principals of Cook with the Cook management team underneath them.
(N.T. 4/13/18, pp. 110-111; N.T. 5/1/18, pp. 197-198).
Subsequently, on June 1, 2010, Cook merged with Advent Design
Corporation to become Advent-Cook Technologies, Inc. (Exhibit P-
85, p. 18). Advent was also a contract manufacturer with
diversified but different products than Cook's as well as a
designer and producer of automation equipment for electric
companies, among others. For reasons which are not apparent on

this record, the merger was unsuccessful and the companies effectively de-merged on April 6, 2011, resulting in a loss to Cook in the amount of $572,000. (N.T. 4/12/18, pp. 104-105; N.T. 4/13/18, pp. 109-113; 4/30/18, pp. 57-60; Exhibit P-26, p. 9; Exhibit P-85, p. 18).

23.  In conjunction with the unwinding of the merger between Cook Technologies and Advent Design, Cook incurred a significant amount of attorneys' fees.  While it is unclear whether Thomas Panzarella promised to pay these attorneys' fees on the company's behalf or advance the company the funds to pay them, it is clear that in August 2011, the Cook ESOP Trustees approved the reimbursement to Panzarella of $25,000, approximately one-half of the funds which he had paid on Cook's behalf to counsel.  (N.T. 4/12/18, pp. 42-45, 225-226; N.T. 5/1/18, pp. 83-84, Exhibits P-110, Panzarella-33).  Subsequently, in conducting her annual audit of the Cook ESOP, Regina O'Keefe, the Company's outside accountant, raised concerns about the propriety of this reimbursement and James Steiker, the attorney for the ESOP, agreed that it may have been a prohibited transaction under Section 406 of ERISA and Section 4975 of the Internal Revenue Code.  Steiker and O'Keefe advised Mr. Panzarella to reimburse the $25,000 to the ESOP and he promptly did so. (N.T. 4/11/18, pp. 205-208; N.T. 4/12/18, pp. 225-228; N.T. 5/1/18, pp. 17-25, 83-84; Exhibit Panzarella-33).

24.    Between 2006 and 2010, Freedom Sciences moved from development of the ATRS concept and raising capital into production of finished products in conjunction with Cook Technologies as its exclusive manufacturer.  Freedom Sciences had its own salespeople with Todd Bick as its national sales manager. (N.T. 4/13/18, pp. 97-98).  Between 2007 and 2010, Freedom Sciences' sales/gross receipts went from $476,464 to $5,894,444 reflecting high acceptance of Freedom Sciences' durable medical equipment products all over the United States as well as some sales in the United Kingdom.  (4/11/18, pp. 149-152; 5/2/18, pp. 16-17; Exhibit Panzarella 138, p. 10).  In 2009 and 2010, more than 50% of Cook Technologies' sales were to Freedom Sciences. (N.T. 5/2/18, pp. 18-19; Panzarella Exhibit 88, p. 4).

25.  On December 28, 2010, Freedom Sciences sold virtually all of its assets, technology and intellectual property to Harmar Mobility Corporation, a global company in the mobility industry which sold items such as stair lifts, automotive wheelchair lifts, in-home elevators and the like for approximately $5 million.  (N.T. 4/11/18, p. 148; N.T. 4/12/18, pp. 238-239; N.T. 4/13/18, pp. 135-137).  It was believed that the sale would be beneficial insofar as Harmar had a vast, global sales network and more financial backing but didn't have much on the manufacturing side.  If Freedom Sciences were to continue to compete with Harmar and grow its sales, it would require a lot more investment

13

and money than it had.  And because Harmar's manufacturing
capability was limited, it was amenable to giving Cook a
continuing agreement for manufacturing the products.  (N.T.
4/12/18, pp. 238-240; N.T. 4/13/18, pp. 140-141; N.T. 5/2/18, pp.
20-23).

26.  At the time of its sale to Harmar, Freedom Sciences'
then-shareholders had the following ownership interests:

1) Advent/Cook Technologies - 63.7%

2) Thomas Panzarella, Sr. - 14.64%

3) Thomas Panzarella, Jr. - 9.76%

4) John R. and Michelle Cunningham - 5.46%

5) Arnold Bradburd - 4.02%

6) Steven Hernandez - .24%

7) Anthony Grimaldi - .24%

8) Gary and Mary (Welch) Staadt - 1.21%

9) Thomas Story - .60%

10) Keven Crawford - .06%

Based upon these ownership interests and after the payment of
certain un-enumerated expenses, Advent-Cook Technologies received
roughly $2,539,697 from the sale of Freedom Sciences.  Thomas
Panzarella, Sr. received $583,346, Thomas Panzarella, Jr.
received $388,897, John and Michelle Cunningham received
$217,313, Arnold Bradburd received $160,132, Steven Hernandez and
Anthony Grimaldi each received $9,722, Gary and Mary Staadt

received $48,036, Thomas Story received $24,018 and Keven Crawford received $2,402. (N.T. 4/11/18, p. 101; N.T. 4/13/18, pp. 137-138; N.T. 5/1/18, pp. 158-160; P-31; P-38; P-62).

27.  Additionally as part of the sale of Freedom Sciences, Cook Technologies and Harmar entered into manufacturing agreements pursuant to which Cook would do the production of the lifting products for two years and the seats for three years. (N.T. 4/13/18, pp. 135, 141; N.T. 5/2/18, p. 23).  Unfortunately, over the course of the next several years, these manufacturing contracts did not provide Cook with the production work or the revenues it had anticipated as Harmar did not, for one reason or another, utilize Cook for all of its manufacturing requirements. (N.T. 4/13/18, pp. 135-136; N.T. 4/30/18, pp. 66-67; N.T. 5/2/18, p. 25; N.T. 4/10/18, pp. 76-82; Exhibit P-4).

28.  After the merger with Advent failed in 2011, Thomas Panzarella proposed that the members of the Cook management team - Nancy Henry, Scott Shiery, Gordon Kulp and Robert Ziegler succeed him in running the company.  (N.T. 4/10/18, pp. 24-25; N.T. 4/12/18, pp. 105-108; N.T. 4/13/18, pp. 107-109; N.T. 4/30/18, pp. 94-95; N.T. 5/1/18, p. 199).  Because he wanted his successors to have some "skin in the game," as he had done when he joined the Company, Panzarella proposed that each of the four purchase the shares which Panzarella owned outside of the Cook ESOP for a total of $100,000 each.  (N.T. 4/10/18, pp. 23-25,

184-186; N.T. 4/11/18, pp. 232-233; N.T. 4/12/18, pp. 207-209; N.T. 4/13/18, pp. 113-116; N.T. 4/30/18, p. 95; N.T. 5/1/18, p. 200-201).

29.    Following the sale of Freedom Sciences and the unwinding of the merger with Advent Design in 2011 and into 2012, Cook Technologies struggled financially, was losing money and was frequently in need of cash to meet its payroll and pay its vendors and other expenses.  (N.T. 4/10/18, pp. 68-70; N.T. 4/11/18, pp. 215-218, 235-236; N.T. 4/12/18, pp. 218, 223, 246-247; N.T. 4/30/18, pp. 85-87; Exhibit P-3).  As Board members and members of the management team, both Mr. Ziegler and Mr. Kulp were aware of Cook's financial condition.  (N.T. 4/10/18, pp. 160-165, 183-190; N.T. 4/12/18, pp. 4/30/18, pp. 47-50).

30.    Neither Ms. Henry nor Mr. Shiery were interested in purchasing stock in the company.  Mr. Kulp and Mr. Ziegler were interested but felt that they could not afford to pay $100,000 each.  It was eventually agreed that Mr. Kulp and Mr. Ziegler would each purchase $50,000 worth of stock but that the stock which they would purchase would be "treasury stock," in lieu of purchasing any of Mr. Panzarella's outside-the-plan shares.  This enabled Cook Technologies to receive an infusion of $100,000 into its operating account to help it pay its operating costs and outstanding bills.  (N.T. 4/10/18, pp. 24-34, 186-188; N.T. 4/11/18, 209-210, 213-216, 229; 4/30/18, pp. 95-100; N.T. 5/1/18,

16

pp. 200-202, 216-217; P-6).

31.   On October 24, 2011, Cook Technologies received the
valuation for its company stock as of December 31, 2010 from
Jeffrey Nelson and Wharton Valuation Associates, Inc., who had
been preparing Cook Technologies' valuations since 2006.  (N.T.
4/30/18, p. 219; Exhibit P-13).  As of December 31, 2010, the
stock was determined to be worth $104.08 per share.  (N.T.
5/1/18, pp. 44-47).  Because Cook was in the process of changing
its year-end reporting from a September 30 - September 30 fiscal
year to a calendar year in 2010, some three days prior, on
October 21, 2011, Mr. Nelson had submitted a valuation for the
company stock as of September 30, 2010 determining it to have a
then-value of $89.89 per share.  (N.T. 4/30/18, pp. 141-142, 210-
211, 226; Exhibit Panzarella-94).

32.   Because there is little to no information generally
available on non-public companies and because of the length of
time it took to amass the financial information and data required
for the preparation of the annual stock valuations and for Cook
to submit that information to Mr. Nelson, it typically took close
to a year to obtain a valuation of Cook's stock for the preceding
year. (N.T. 4/30/18, pp. 214-217, 228-231; Panzarella Exhibits
93-100).  Consequently as of March, 2012, Mr. Nelson had yet to
prepare his annual valuation of Cook's stock for the year ended
2011 (the 2011 valuation was not completed until September 28,

2012), and the last known value at that time was $104.08 per share. (N.T. 4/30/18, p. 235; N.T. 5/1/18, pp. 45-46).

33.  Thomas Panzarella individually owned some 6,795 shares of Cook stock outside of the ESOP.  (N.T. 5/1/18, p. 201). Initially in November 2011, Panzarella, Kulp and Ziegler after consultation with Nancy Henry and Cook's outside accountants, Regina O'Keefe and Alan Wecht of Gable, Peritz, Mishkin LLP, sought to transact a total of 1,114 shares (557 shares each to Kulp and Ziegler) for the discounted sale price of $89.89 per share (*i.e.*, the September 30, 2010 value).  (Exhibit Panzarella-22).  However, since the most current available valuation of the stock was $104.08 as of December 2010, O'Keefe and Wecht advised that Kulp and Ziegler would have to recognize deemed compensation in the amount of $7,903.83 each, which would be subject to all applicable payroll taxes.  (N.T. 4/10/18, pp. 34-36; N.T. 4/11/18, pp. 211-213, 225-226; N.T. 4/30/18, pp. 142-143; N.T. 5/1/18, pp. 43-47, 209-210; P-6; P-80; Panzarella-24; Panzarella-25).  In the end, Cook Technologies paid bonuses to Messrs. Kulp and Ziegler in the amount of the difference between the $89.89 desired stock price and the valuation price of $104.08.  (N.T. 4/11/18, pp. 237-238; N.T. 5/1/18, p. 207, 214-215; P-80).  They formally acquired some 480 Treasury shares each in mid-February, 2012 for $104.08 per share or $49,958 each, notwithstanding that that price was unlikely to be the stock's actual fair market

value as of the date of their purchase. (N.T. 4/10/18, pp. 40-41; N.T. 4/30/18, pp. 97-100, 234; N.T. 5/1/18, p. 220, 223).

34. On December 21, 1990, Thomas Panzarella had entered into a "Redemption Agreement" with Cook pursuant to which the Company was required to buy and Panzarella was required to sell all of his individually owned stock in the company in the event his employment terminated in any way, including retirement. To fund this purchase, Cook took out a $3 million insurance policy on Panzarella's life. (N.T. 4/30/18, pp. 148-149, 200-201; Exhibit Panzarella-9). This redemption agreement was subsequently modified on August 8, 1991 such that it was agreed that a life insurance policy then owned by the company in the amount of $1.5 million on Mr. Panzarella's life was sufficient. (Exhibit Panzarella-9). The $1.5 million life insurance policy was to enable the company to purchase Mr. Panzarella's shares in the event of his death. (N.T. 4/30/18, pp. 200-201). At some unknown time and for some unknown reason, the ownership of that insurance policy was transferred from the Company to the ESOP. (N.T. 4/30/18, pp. 173-177, 198-200; Exhibit P-5; Exhibit Panzarella-21).

35. The redemption agreement as modified remained in effect until February 14, 2012 when a Stockholder Agreement of that same date between Panzarella, Kulp, Ziegler and the Company was executed. (N.T. 4/30/18, pp. 199-205; Exhibits Panzarella 10,

Panzarella 21, Panzarella 27).  Under this Stockholder Agreement, upon the termination of employment of any of the three parties thereto, that employee's stock was to be deemed to have been offered for sale exclusively to the Company and the Company had the option to purchase all but not less than all of the offered stock within sixty days.  Should the Company elect not to purchase the offered stock, the employee was free to make any "Voluntary Lifetime Transfer" to an outside individual(s) provided that notice of the identity, address, and business or occupation of that outside offeree be disclosed to the Company and the Company would again have sixty days within which to elect to buy all of the offered stock.  Should the Company again elect to not exercise its option to buy, the Lifetime Transfer could be consummated.  (Exhibit Panzarella-10; N.T. 4/30/18, 136-139, 148-149, 202).

36.  When Fran Undorfer retired in 2006, he sold his outside-the-plan shares in Cook Technologies to the ESOP. At that time, the ESOP trustees decided to buy Undorfer's stock instead of the Company redeeming it at the time of his retirement. Unlike Mr. Panzarella, however, Mr. Undorfer did not have a Redemption Agreement. (N.T. 4/30/18, pp. 202-203; Exhibit Panzarella-26).

37.  During the discussions concerning the purchase by Messrs. Kulp and Ziegler of treasury stock in lieu of purchasing

stock directly from him, Mr. Panzarella asked Cook's corporate counsel, William Watts, Esquire, whether he was correct that he could exercise the "put" option in his employment agreement to "put" 960 shares or $100,000 worth of his outside stock into the ESOP. In that manner, the ESOP would purchase some of his outside shares, just as it done with Fran Undorfer. (N.T. 4/30/18, pp. 201-202; N.T. 5/1/18, pp. 215-216; Exhibit Panzarella-26). Mr. Watts responded that Mr. Panzarella's employment agreement had long since expired and, in any event, there was no "put" option in the agreement. However, he confirmed that, subject to running the idea by James Steiker, the ESOP's counsel, the ESOP trustees could exercise their discretion and elect to buy Panzarella's shares. "Otherwise, under the Stockholders Agreement, when [Panzarella] retires, [he] is required to sell and the company is required to purchase [his] outside shares." (N.T. 4/30/18, pp. 203-205; N.T. 5/1/18, pp. 217-218; Exhibit Panzarella-26).

38. On February 14, 2012, Mr. Panzarella spoke with Mr. Steiker and asked if there were any restrictions or any type of "prohibitive" transaction under the Cook ESOP or ERISA regulations pertaining to him selling approximately 1,000 of his outside-the-plan shares to the ESOP. (N.T. 4/30/18, pp. 208-209; N.T. 5/1/18, pp. 208-209; Exhibit P-56; Exhibit Panzarella-29). In an email to Mr. Watts on which he copied Regina O'Keefe and

Nancy Henry, Mr. Panzarella related that Mr. Steiker had advised him "that the only rules that had to be followed were that the shares must be sold at the value known at the time of the transaction ($104.08 per share) and that the Trustee(s) of the Plan must agree to the transaction." (N.T. 4/30/18, p. 209; N.T. 5/1/18, pp. 222-224; Exhibit P-56; Exhibit Panzarella-29). Regina O'Keefe did not respond to this email and she doesn't remember when she first saw it. (N.T. 5/1/18, p. 30).

 39. Between March and May of 2012 and pursuant to a "Unanimous Consent of Trustees In Lieu of Special Meeting" of the Cook Technologies Employee Stock Ownership Plan, Thomas Panzarella sold a total of 3,000 shares of his individually-owned stock to the Cook ESOP in 1,000 share increments at $104.08 per share for a total price of $312,240.00. This Unanimous Consent was executed by the three then-Trustees of the Cook ESOP on March 1, 2012: Thomas Panzarella, Michael Finnegan and Robert Ziegler. (N.T. 4/10/18, pp. 64-66; N.T. 4/12/18, pp. 47-51, 242-248; N.T. 4/30/18, pp. 100-102; N.T. 5/1/18, p. 225; Exhibit P-2; Exhibit P-282; Exhibit Panzarella-12; Exhibit P-2). Although the exact value of the Cook Technologies' stock as of March 1, April 27 and May 9, 2012 was never ascertained, it is evident that Cook's stock value as of those dates was less than $104.08 per share. (N.T. 4/9/18, pp. 104-114; N.T. 4/30/18, pp. 212-216, 220-223, 231-234; Exhibits P-18, P-19, P-26; Exhibit Panzarella-12).

40.  After receiving the proceeds from the sale of 3,000 of his privately owned shares to the ESOP, Mr. Panzarella then loaned Cook Technologies $208,160, secured by a Demand Note, to get some cash into the company given that it had been experiencing financial difficulties "from the de-merger and Cook's portion of Freedom Sciences."  (N.T. 4/10/18, pp. 65-71, 203-204; N.T. 4/11/18, pp. 215-220, 223-224; N.T. 4/12/18, pp. 53-54; N.T. 4/30/18, pp. 100-105, 127-130; N.T. 5/1/18, pp. 225-226; Exhibits P-1, P-3, Panzarella-12,Panzarella-18, Panzarella-19).

41.  In order to pay Thomas Panzarella for his outside-the-plan shares, the ESOP cashed in the $1.5 million life insurance policy which it owned on the life of Mr. Panzarella.  That policy had a cash surrender value of $275,776.40 which, after payment of the surrender charges, yielded $222,871.10 to the ESOP.  (N.T. 4/11/18, pp. 235-237; N.T. 4/30/18, pp. 146-147, 200-201; N.T. 5/1/18, pp. 225-226; Exhibits Panzarella-14 and Panzarella-15).

42.  James Steiker first learned in October 2012 that Mr. Panzarella had sold some of his privately-held Cook stock to the ESOP.  (N.T. 5/1/18, p. 87).  Although Mr. Steiker has no recollection of it, his records reflect that Mr. Panzarella did call him in early 2012 to ask about the propriety of doing that. The "uniform advice" which Mr. Steiker would have given to Mr. Panzarella "would have been that any transaction must take place

according to valuation dated the date of the actual transaction."
Mr. Steiker "would have advised the client to get a valuation"
and "would have suggested that we ask the appraiser to advise and
provide to the trustee what we would call a bring-down letter..."
(N.T. 5/1/18, p. 88). Thus, Mr. Panzarella's February 14, 2012
email to Watts, O'Keefe and Henry was accurate only up until the
point in which it quoted the dollar value per share. (N.T.
5/1/18, p. 90-91; Exhibit P-56; Panzarella-29).

43. Regina O'Keefe did not respond to Mr. Panzarella's
February 14, 2012 email either. Instead, more than two years
later - in or around August 2014 when she was conducting the 2012
audit for the Cook ESOP, Ms. O'Keefe reviewed Mr. Panzarella's
email of February 14, 2012 and became concerned that the stock
value used for the transfer was a stale value at the time that
Mr. Panzarella sold his stock to the ESOP. (N.T. 5/1/18, pp. 31-
32; P-56). On August 13, 2014, Ms. O'Keefe emailed Mr. Steiker
attaching the February 14, 2012 email and asked that he provide a
legal opinion letter verifying the advice which Mr. Panzarella
said he had been given. (N.T. 5/1/18, pp. 32-33; P-56).

44. Later that same day, Mr. Steiker responded to Ms.
O'Keefe's inquiry thusly:

> I have not seen this email before. Tom correctly states
> that I advised that he could sell his individually-owned
> shares to the ESOP for fair market value as determined by
> the ESOP as of the date of the transaction. I also probably
> advised him that the corporation could redeem his shares for
> a value it reasonably believed was fair. The problem here

is that Tom conflated the two scenarios and sold his shares to the ESOP for the most recently available valuation, which was 15 months old at the time of the sale.  He would have needed a specially updated valuation as of the date of his sale to sell his shares to the ESOP in March of 2012.

(N.T. 5/1/18, p. 33, 91-92, 95-96; Exhibit P-35).

45.  Under ERISA, there is a very strict and complicated relationship between ESOPs and related parties.  (N.T. 5/1/18, p. 108).  Thomas Panzarella, as the President, Officer and Director of Cook Technologies and as an at-least 5% shareholder in the company, was a related, party in interest.  (N.T. 4/12/18, pp. 224-225; N.T. 5/1/18, p. 85-86, 97-98).

46.  A stock redemption differs from the situation where an ESOP purchases stock from a party in interest.  In a redemption, it is the corporation which purchases stock.  The corporation's Board of Directors, in buying back stock from a shareholder operates under a set of corporate fiduciary duties imposed by state law.  Those fiduciary duties do not require an independent appraisal. Rather, the Board of Directors is required to exercise fundamentally sound business judgment and honor their duties of loyalty and care to all of the shareholders and in so doing may engage in a transaction for a value which is fair and which they reasonably believe is fair as of the date of the transaction.  (N.T. 5/1/18, pp. 95-96).

47.  Although it is generally prohibited for an ESOP to purchase stock from a party in interest, there are a few

exceptions to that general rule under ERISA, one of which exists where there is a valuation opinion dated as of the date of the transaction by a qualified independent appraiser and the ESOP Trustee(s) otherwise conclude(s) in good faith that the purchase is in the best interest of the plan participants. (N.T. 5/1/18, p. 97).

48. If it were not for Mr. Kulp and Mr. Ziegler's election to purchase Cook stock and to assume management of the company, Mr. Panzarella's Redemption Agreement would have remained in effect and upon his retirement, the Company would have been required to buy his shares from him at whatever value the Board reasonably believed was fair and reasonable as of the date of the transaction without having to obtain a formal opinion from an independent appraiser as to what the share value was on the date of the sale. (N.T. 5/1/18, pp. 96-97, 219-220).

49. In calculating the value of Cook's stock for 2010 as well as in other years, Jeffrey Nelson of Wharton Valuation Associates, considered the financial statements for the Company for the years ended September 30, 2000-2010 and for the three month period ended December 31, 2010, as well as other documents and pertinent data supplied by Cook's management, including financial projections. (N.T. 4/30/18, pp. 210-214; Exhibit P-13; Exhibit Panzarella-95). Given that it had been the pattern in previous years that Cook's financial projections did not match up

with its actual numbers, Mr. Nelson utilized a very high discount rate in computing his valuations. (N.T. 4/30/18, pp. 214-215). Employing a high discount rate results in a lower present value such that the high discount rate offsets the lack of certainty posed by optimistic projections. (N.T. 4/30/18, pp. 225-227). And in fact, the actual numbers for 2010 did not live up to the projections that were given. (N.T. 4/30/18, pp. 214-215). By 2012, Cook's business had declined so radically that there were no projections given and any projections that would have been given were meaningless. (N.T. 4/30/18, pp. 220-223). The corrected valuation for Cook's stock as of December 31, 2011 was determined on July 31, 2013 to be $64.11 per share. (N.T. 4/30/18, p. 235; Exhibits Panzarella-96, Panzarella-97). Cook's stock as of December 31, 2012 was subsequently valued on October 11, 2013 at $14.48 per share. (N.T. 4/30/18, pp. 228-233; Exhibit Panzarella-98).

50. Sadly, the value of Cook's stock fared no better over the next several years. On October 7, 2014, Jeffrey Nelson determined that the stock had no discernable value as of December 31, 2013 and had a fair market vale of zero dollars as of December 31, 2014, when Nelson completed the valuation for that year on October 2, 2015. (N.T. 4/30/18, pp. 233; Panzarella Exhibits 99, 100, 101, 102).

51. Presently and as of the date of this Decision, the

value of the stock of Cook Technologies as of the dates in March, April and May of 2012 when Mr. Panzarella sold his stock to the ESOP remains unknown. Those values have never been calculated or otherwise determined. (N.T. 4/10/18, pp. 22-24; N.T. 4/11/18, pp. 16-18; Exhibit P-26).

52. The Cook Employees Stock Option Plan (ESOP) has two components: a company stock account in which a vested employee has an ownership interest in the Cook Technologies' stock owned by the ESOP and a cash investment account in which a vested employee has an ownership interest in the other, outside investments owned by the ESOP. (N.T. 4/10/18, pp. 141-145; N.T. 4/30/18, 153, 155, 157; N.T. 5/1/18, p. 85; Exhibits P-79, P-80, P-81). When an employee retires, after the stock valuation has been done for the retiring year, the retiree is to be paid the entirety of the cash portion of their account at that time. The remaining, company stock portion is to be distributed in five equal, annual installments with the first (1/5) installment to be paid at the time the cash portion of the account is distributed. (N.T. 4/10/18, pp. 100-106, 141-146, 167-173; N.T. 4/30/18, pp. 111, 153-156; N.T. 5/1/18, pp. 101-102, 111-114; P-141).

53. The annual statements which Thomas Panzarella received from the Cook ESOP reflect the following holdings and values for the following years - for 2010: Company Stock Account - 9,538.365 shares valued at $992,753.00; Cash Investment Account -

28

$246,409.03. (Exhibit Panzarella-78). For 2011, he had
9,371.447 shares with a value of $605,957.76 in his Company Stock
Account and a $258,266.24 value of his Cash Investment Account.
(Exhibit Panzarella-80). In 2012, his Company Stock Account held
10,517.049 shares then worth $152,286.86 and the Cash Investment
Account was then valued at $186,053.64. (Exhibit Panzarella-81).
In 2014, his Company Stock Account held 11,053.931 shares with no
value and his Cash Investment Account had a value of $230,064.76.
(Exhibit Panzarella-82). (N.T. 4/30/18, pp. 153-159; 5/1/18, pp.
231-233). For Plan years 2011 and 2012, Mr. Panzarella's
Statements of Account reflect deductions from his cash account of
$5,120.15 and $93,139.74, respectively for "cash used to purchase
additional shares." (Exhibits Panzarella-80 and Panzarella-81).
Although Mr. Panzarella received no explanation whatsoever for
why these deductions were made or what additional shares were
purchased with these funds, purportedly these deductions were
attributable to the re-purchase by the ESOP of shares that had
been held by retirees or deceased employees. (N.T. 4/30/18, pp.
155-158: N.T. 5/1/18, pp. 232-233).

54. Ostensibly because they had been advised by their
current-legal counsel and "ESOP specialist" Peter Gulia that they
could be exposing themselves to personal liability, Messrs. Kulp,
Ziegler and Finnegan, acting in their various capacities as
Company Directors and ESOP Trustees, have refused to pay Thomas

Panzarella the ESOP monies due to him as a consequence of his retirement until the "prohibited transaction" surrounding his sale of stock to the ESOP is un-done. (N.T. 4/10/18, pp. 112-113, 116-117, 163-166; 208-209, 211-227; N.T. 4/11/18, pp. 14-16; N.T. 4/30/18, pp. 107-111, 166-167). Cook has also not re-paid any portion of the $208,160 loan made by Mr. Panzarella. (N.T. 4/10/18, pp. 203-205).

55. To "undo" the "prohibited transaction," Messrs. Kulp, Ziegler and Finnegan believe that Thomas Panzarella must re-pay the $312,240.00 which he received through the sale of the 3,000 shares of his outside-the-plan Cook stock to the ESOP. They do not believe that it is necessary that Mr. Panzarella be re-paid anything for the $208,160 loan which he made to the company, however. (N.T. 4/10/18, pp. 203-205, 211-225; N.T. 4/11/18, pp. 14-17; N.T. 4/30/18, pp. 127-130; Exhibit P-1). To date, Cook has not paid Thomas Panzarella anything from either the Cash Investment portion or the Company Stock portion of his retirement account. (N.T. 4/30/18, p. 135, 152, 157-159; 5/1/18, pp. 231-233).

56. Notwithstanding that the Cook ESOP likewise purchased Mr. Undorfer's outside-the-plan shares, at no time was Mr. Undorfer required to reverse the sale of his shares to the ESOP nor were his retirement or other benefits withheld until such time as he reversed the transaction. (N.T. 4/30/18, pp. 202-204;

N.T. 5/1/18, pp. 115-116).

57.    Subsequent to his retirement on or about June 1, 2012, Thomas Panzarella entered into a Salary Continuation/Non-Competition Agreement with Cook whereby it was agreed that Mr. Panzarella would provide continuing business development services for the company for a one-year period and would not compete with the company in any way and would not disclose any of the company's confidential or proprietary information in exchange for an annual salary of $50,000 payable weekly, and continued company-paid health, dental, long-term disability and life insurance coverage.  In addition, the Agreement provided that the Company would turn over the title to and cancel the automobile coverage which it had been providing on Panzarella's vehicle and convert his 764 hours of earned vacation time into a note payable at the rate of $1,155.33 per month.  (N.T. 4/30/18, pp. 150-152; N.T. 5/1/18, pp. 226-227; Exhibit Panzarella-16).  Although Mr. Panzarella fulfilled his obligations under the Salary Continuation Agreement, he has received some, but not all, of the benefits outlined in the Salary Continuation Agreement.  (N.T. 4/10/18, pp. 200-202, 207-211; N.T. 4/30/18, pp. 163-164; N.T. 5/1/18, p. 227; Exhibits Panzarella-44, Panzarella-47, Panzarella-60, Panzarella-61).

## DISCUSSION

By this action, Cook Technologies[5] brings four claims
against Thomas Panzarella under the Employee Retirement Income
Security Act ("ERISA"), 29 U.S.C. §1001, *et. seq.*: for violation
of the proscription against prohibited transactions, for breach
of fiduciary duty, for an offset against Panzarella's plan
benefits and for the appointment of an independent fiduciary[6].
Additionally, via a counterclaim asserted in <u>Panzarella v. Cook
Technologies, et. al.</u>, Civ. A. No. 15-3568, the Cook parties
assert three counts against Panzarella under the Racketeer
Influence and Corrupt Organizations Act, 18 U.S.C. §§1962(b),
(c), and (d), and two additional counts for breach of fiduciary
duty. Thomas Panzarella in turn, brings two claims against Cook
Technologies[7] under §§502(a)(1)(B) and 502(a)(2) of ERISA, 29
U.S.C. §§1132(a)1)(B) and (a)(2) for failure to pay him the
retirement benefits due and owing and breach of fiduciary duty

---

[5] In actuality, there are four plaintiffs in the action against Mr.
Panzarella - the Cook Technologies, Inc. Employee Stock Ownership Plan (ESOP),
Cook Technologies, Inc., as the Plan's administrator, the Cook Technologies,
Inc. Employee Stock Ownership Plan Trust and Michael L. Finnegan, as a plan
participant and in his capacity as a Trustee of the Plan Trust. For ease of
reference, we shall variously refer to the Plaintiffs as "Cook Technologies,"
"Cook" or the "Cook plaintiffs."

[6] Insofar as there was no evidence presented on the Cook Parties' claim
for appointment of an independent fiduciary and no mention of this claim in
any of their pretrial filings, the Court deems this claim as having been
abandoned.

[7] Similarly, in Mr. Panzarella's suit, he seeks relief against Cook
Technologies, Inc., itself and as the plan administrator for the Cook
Technologies, Inc. Employee Stock Ownership Plan ("ESOP"), Michael L.
Finnegan, individually and as Trustee of the Cook Technologies ESOP and Cook
Technologies Employee Stock Ownership Plan Trust (ESOT"), Gordon Kulp and
Robert Ziegler, individually and as Trustees of the Cook ESOP and Cook ESOT,
and the Cook ESOP and Cook ESOT as separate entities. Likewise, we shall
refer to these defendants as "Cook" or the "Cook defendants."

and under Pennsylvania state law for breach of contract and violations of the Pennsylvania Wage Payment and Collection Law, 43 P.S. 260.1, *et. seq.* In his counterclaim in <u>Cook Technologies, et. al. v. Panzarella</u>, Civil Action No. 15-1028, Mr. Panzarella adds claims for breach of the Salary Continuation Agreement and for Indemnification by the Cook ESOP.

> *A. ERISA/Breach of Fiduciary Duty Claims*

At its core, this is an action that has arisen under ERISA, which was erected in 1974 and which remains a comprehensive and complex scheme for regulating employee benefit plans. <u>Estate of Kensinger v. URL Pharma, Inc.</u>, 674 F.3d 131, 135 (3d Cir. 2012). It has been said that "ERISA's central purpose is to protect the security of employee pension plans and to insure that benefits which have vested are paid to employees." <u>Crown Cork & Seal Co. v. Central States Southeast & Southwest Areas Pension Fund</u>, 982 F.2d 857, 861 (3d Cir. 1993)(citing <u>Pension Benefit Guaranty Corp. v. R.A. Gray & Co.</u>, 467 U.S. 717, 104 S. Ct. 2709, 81 L. Ed.2d 601 (1984)). "Because 'Congress did not require employers to establish benefit plans in the first place, ERISA represents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans.'" <u>Renfro v. Unisys Corp.</u>, 671 F.3d 314, 321 (3d Cir. 2011)(quoting <u>Conkright v. Frommert</u>, 559 U.S. 506, 516, 130 S. Ct. 1640, 1648-49, 176 L. Ed.2d 469 (2010)).

"ERISA abounds with the language and terminology of trust law... [and] ERISA's legislative history confirms that the Act's fiduciary responsibility provisions, 29 U.S.C. §§1101-1114, codify and make applicable to ERISA fiduciaries certain principles developed in the evolution of the law of trusts." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 110, 109 S. Ct. 948, 954, 103 L. Ed.2d 80 (1989).[8]  For one, "ERISA requires

---

[8]  Indeed throughout, the ERISA statute is rife with the notions of trust and fiduciary obligations.  For example:

Under 29 U.S.C. §1002(21)(A), ... "a person is a fiduciary with respect to a plan to the extent (I) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ..."

And:

- Section 402(a) addresses the pre-requisites for establishment of an employee benefit plan and requires the designation of "one or more fiduciaries" "in the plan instrument" "who jointly or severally shall have authority to control and manage the operation and administration of the plan."  29 U.S.C. §1102(a);

- Section 403(a) dictates that "[e]xcept as provided in subsection (b), all assets of an employee benefit plan shall be held in trust by one or more trustees..."  29 U.S.C. §1103(a);

- Section 404, 29 U.S.C. §1104 is entitled "Fiduciary duties," and dictates the application of the prudent man standard of care in subsection (a)(1) as follows:

Subject to sections 403(c) and (d), 4042 and 4044 [29 U.S.C. §§1103(c),(d), 1342, 1344], a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -

(A) for the exclusive purpose of:

(I) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct

34

each plan to have one or more named fiduciaries that are granted the authority to manage the operation and administration of the plan." Renfro, supra(citing 29 U.S.C. §1102(a)(1)). Furthermore, "[t]o help fulfill ERISA's broadly protective purposes, Congress commodiously imposed fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive." John Hancock Mutual Life Insurance Co. v. Harris Trust and Savings Bank, 510 U.S. 86, 96, 114 S. Ct. 517, 524, 126 L. Ed.2d 524 (1993). "An ERISA fiduciary must discharge its duties with respect to a plan

> 'solely in the interest of the participants and beneficiaries and -
>
> (A) for the exclusive purpose of:
>
>> (I) providing benefits to participants and their beneficiaries..."

Id, 510 U.S. at 94, 114 S. Ct. at 523 (quoting 29 U.S.C. §1104(a)(1). Stated otherwise, "ERISA trustees must act in the interest of the employee benefit plans they serve: their duties and powers 'reflect Congress' policy of assuring the equitable character' of the plans and they are held accountable to the

---

of an enterprise of a like character and with like aims;

(C) by diversifying investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and title IV.

plans for their breaches." Bixler v. Central Pennsylvania

Teamsters Health & Welfare Fund, 12 F.3d 1292, 1298 (3d Cir.

1993)(quoting Central States, Southeast & Southwest Areas Pension

Fund v. Central Transport, Inc., 472 U.S. 559, 570, 105 S. Ct.

2833, 86 L. Ed. 2d 447 (1985)).  It should be noted that

"[c]onsistent with these common law principles, the courts

measure section 1104(a)(1)(B)'s 'prudence' requirement according

to an objective standard, focusing on a fiduciary's conduct in

arriving at an investment decision, not on its results, and

asking whether a fiduciary employed the appropriate methods to

investigate and determine the merits of a particular investment."

In re Unisys Savings Plan Litigation, 74 F.3d 420, 434 (3d Cir.

1986).

In the event of a breach of fiduciary duty, Section 502(a)

of the Statute empowers the commencement of a civil action by,

*inter alia*:

    (1) a participant or beneficiary -

        (A) for the relief provided for in subsection (c) of
        this section [a Plan Administrator's refusal to supply
        requested information], or

        (B) to recover benefits due to him under the terms of
        his plan, to enforce his rights under the terms of the
        plan, or to clarify his rights to future benefits under
        the terms of the plan;

            ...

    (3) a participant, beneficiary, or fiduciary -

        (A) to enjoin any act or practice which violates any

36

provision of this title or the terms of the plan, or

(B) to obtain other appropriate equitable relief

(I) to redress such violations or

(ii) to enforce any provisions of this title or the terms of the plan;

29 U.S.C. §1132(a)(1), (3). This provision has been held to authorize direct suits against fiduciaries for breach of their duties. See, e.g., Renfro v. Unisys, 671 F.3d at 325(citing Bixler, 12 F.3d at 1293-94).

In furtherance of the notions of trust and fiduciary responsibility, the Statute also outlines what not-to-do, that is, it delineates certain "prohibited transactions." In this regard, "Congress enacted §406 [29 U.S.C. §1106] 'to bar categorically a transaction that is likely to injure the pension plan.'" Lockeed Corp. v. Spink, 517 U.S. 882, 888, 116 S. Ct. 1783, 1788, 135 L. Ed.2d 153 (1996)(quoting Commissioner v. Keystone Consol. Industries, Inc., 508 U.S. 152, 160, 113 S. Ct. 2006, 2012, 124 L. Ed.2d 71 (1993)). Specifically, §406 provides:

**§1106. Prohibited transactions**

**(a) Transactions between plan and party in interest.** Except as provided in section 408 [29 U.S.C. §1108]:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect -

(A) sale or exchange, or leasing of any property

37

between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 407(a) [29 U.S.C. §1107(a)].

(2) No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 407(a) [29 U.S.C. §1107(a)].

**(b) Transactions between plan and fiduciary.** A fiduciary with respect to a plan shall not -

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

**(c) Transfer of real or personal property to plan by party in interest.** A transfer of real or personal property by a party in interest to a plan shall be treated as a sale or exchange if the property is subject to a mortgage or similar lien which the plan assumes or if it is subject to a mortgage or similar lien which a party-in-interest placed on the property within the 10-year period ending on the date of the transfer.

Thus, "Section 406(a)(1) regulates the conduct of plan fiduciaries, placing certain transactions outside the scope of their lawful authority [and] [w]hen a fiduciary violates the rules set forth in §406(a)(1), §409 of ERISA renders him personally liable for any losses incurred by the plan, any ill-gotten profits and other equitable and remedial relief deemed appropriate by the court." <u>Lockheed</u>, <u>supra</u> (citing 29 U.S.C. §1109(a)).[9]

---

[9] "Congress defined 'party in interest' to encompass those entities that a fiduciary might be inclined to favor at the expense of the plan's beneficiaries." <u>Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.</u>, 530 U.S. 238, 242, 120 S. Ct. 2180, 2185, 147 L. Ed.2d 187 (2000). More particularly, a "party in interest" is defined at 29 U.S.C. §1002(14) to mean, "as to an employee benefit plan -

(A) any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan;

(B) a person providing services to such plan;

(C) an employer any of whose employees are covered by such plan;

(D) an employee organization any of whose members are covered by such plan;

(E) an owner, direct or indirect, of 50 percent or more of -

(I) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation.[,]

(ii) the capital interest or the profits interest of a partnership, or

(iii) the beneficial interest of a trust or unincorporated enterprise, which is an employer or an employee organization described in subparagraph (C) or (D);

(F) a relative (as defined in paragraph 15)) of any individual described in subparagraph (A),(B), (C), or (E);

(G) a corporation, partnership, or trust or estate of which (or in which) 50 percent or more of -

(I) the combined voting power of all classes of stock entitled to

However, as referenced in the opening paragraph of Section 406(a), in Section 408, 29 U.S.C. §1108(e)[10], "Congress enacted a

---

     vote or the total value of shares of all classes of stock of such corporation,

     (ii) the capital interest or profits interest of such partnership, or

     (iii) the beneficial interest of such trust or estate,

is owned directly or indirectly, or held by persons described in subparagraph (A), (B), (C), (D), or (E);

(H) an employee, officer, director (or an individual having powers or responsibilities similar to those of officers or directors), or a 10 percent or more shareholder directly or indirectly, of a person described in subparagraph (B), (C), (D), (E), or (G) of the employee benefit plan; or

(I) a 10 percent or more (directly or indirectly in capital or profits) partner or joint venturer of a person described in subparagraph (B), (C), (D), (E) or (G).

---

[10]  Section 408(e) reads as follows:

     ...

**(e) Acquisition or sale by plan of qualifying employer securities; acquisition, sale, or lease by plan of qualifying employer real property.**

Sections 406 and 407 [29 U.S.C. §§ 1106 and 1107] shall not apply to the acquisition or sale by a plan of qualifying employer securities (as defined in section 407(d)(5) [29 U.S.C. § 1107(d)(5)] or acquisition, sale or lease by a plan of qualifying employer real property (as defined in section 407(d)(4) [29 U.S.C. §1107(d)(4)]) -

     (1) if such acquisition, sale, or lease is for adequate consideration) or in the case of a marketable obligation, at a price not less favorable to the plan than the price determined under section 407(e)(1) [29 U.S.C. §1107(e)(1)]),

     (2) if no commission is charged with respect thereto, and

     (3) if -

          (A) the plan is an eligible individual account plan (as defined in section 407(d)(3) [29 U.S.C. § 1107(d)(3)]), or

          (B) in the case of an acquisition or lease of qualifying employer real property by a plan which is not an eligible individual account plan, or of an acquisition of qualifying

conditional exemption from the prohibited transaction rules for acquisition of employer securities by ESOPs and certain other plans." Donovan v. Cunningham, 716 F.2d 1455, 1465 (5th Cir. 1983). Under this exemption, "[a]n ESOP may acquire employer securities in circumstances that would otherwise violate Section 406 if the purchase is made for "adequate consideration." Id. "Adequate consideration" is defined in ERISA Section 3, 29 U.S.C. §1002(18) as meaning:

> (A) in the case of a security for which there is a generally recognized market, either (I) the price of the security prevailing on a national securities exchange which is registered under section 6 of the Securities Exchange Act of 1934 [15 U.S.C. § 78f], or (ii) if the security is not traded on such a national securities exchange, a price not less favorable to the plan than the offering price for the security as established by the current bid and asked prices quoted by persons independent of the issuer and of any party in interest; and

> (B) in the case of an asset other than a security for which there is a generally recognized market, the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary.

"In order to rely on the adequate consideration exemption, a trustee or fiduciary has the burden to establish that the ESOP paid no more than fair market value for the asset, and that the fair market value was determined in good faith by the fiduciary." Henry v. Champlain Enterprises, Inc., 445 F.3d 610, 619 (2d Cir.

---

employer securities by such a plan, the lease or acquisition is not prohibited by section 407(a) [29 U.S.C. § 1107(a)].

2006)(quoting <u>Chao v. Hall Holding Co., Inc.</u>, 285 F.3d 415, 436
(6th Cir. 2002)); <u>Perez v. First Bankers Trust Services</u>, Civ. A.
No. 12-4450, 2017 U.S. Dist. LEXIS 52117 at *207 (D.N.J. March
31, 2017).  "ESOP fiduciaries will carry their burden to prove
that adequate consideration was paid by showing that they arrived
at their determination of fair market value by way of a prudent
investigation in the circumstances then prevailing."  <u>Donovan v.</u>
<u>Cunningham</u>, 716 F.2d at 1467-1468.

That having been said and although "securing an independent
assessment from a financial advisor or legal counsel is evidence
of a thorough investigation, it is not a complete defense to a
charge of imprudence."  <u>Howard v. Shay</u>, 100 F.3d 1484, 1489 (9th
Cir. 1996)(citing, *inter alia*, <u>Martin v. Feilen</u>, 965 F.2d 660,
670-671 (8th Cir. 1992), <u>Donovan v. Mazzola</u>, 716 F.2d 1226, 1234
(9th Cir. 1983) and <u>Donovan v. Bierwirth</u>, 680 F.2d 263, 272 (2d
Cir. 1982)).  "The fiduciary must (1) investigate the expert's
qualifications, (2) provide the expert with complete and accurate
information, and (3) make certain that reliance on the expert's
advice is reasonably justified under the circumstances."  <u>Id</u>.
What's more, "[t]o use an independent appraisal properly, ERISA
fiduciaries need not become experts in the valuation of closely-
held stock – they are entitled to rely on the expertise of
others.  <u>Cunningham</u>, 716 F.2d at 1474.  "However, as the source
of the information upon which the experts' opinions are based,

the fiduciaries are responsible for ensuring that that information is complete and up-to-date." Id.

In this case, the parties appear to agree that Thomas Panzarella's sale of 3,000 shares of his "outside-the-plan" stock in Cook Technologies at the per-share price of $104.08 was, in fact, a prohibited transaction under Section 406. As the then-President of Cook Technologies and one of the Trustees of the ESOP, Thomas Panzarella was clearly a party-in-interest at the time of these three transactions. It was therefore incumbent upon the Plan's fiduciaries at the time – Thomas Panzarella, Michael Finnegan and Robert Ziegler, to verify that the amount to be paid for the stock purchases was "no more than fair market value, ..." and to undertake a good faith investigation into the fair market value so as to ensure that the transactions were for no more than adequate consideration. See, e.g., Henry, supra.

However, here it is apparent that the only Trustee to conduct any investigation into the appropriate value for the stock was Thomas Panzarella, who was of course, the party-in-interest. Mr. Panzarella's investigation quite properly began with consulting the attorneys for both Cook Technologies, the company, and the Cook ESOP - William Watts and James Steiker. Mr. Watts deferred to Mr. Steiker's opinion as Mr. Steiker was the ESOP's attorney and had far more expertise in ERISA matters than did Mr. Watts. It also appears that there were some

43

discussions with Regina O'Keefe and Alan Wecht, Cook's outside accountants and auditors, given that they were consulted and gave advice on the tax implications to be realized by Mr. Ziegler and Mr. Kulp if the stock valuation as of September 30, 2010 were utilized in lieu of the valuation as of December 31, 2010. Notwithstanding the propriety of these consultations, Mr. Panzarella did nothing more and misinterpreted the advice that he was given. As Mr. Steiker testified, while he advised Mr. Panzarella that he could sell his individually-owned shares to the ESOP for fair market value as determined by the ESOP as of the date of the transaction and that the corporation could redeem his shares for a value it reasonably believed was fair, he did not find it surprising that Panzarella could have "conflated" this advice with the result that he sold his shares to the ESOP for the most recently available valuation, which was then 15 months old at the time of the sale.

And, although Mr. Panzarella relayed what he understood Mr. Steiker's advice to be in a confirming email sent on February 14, 2012 to Nancy Henry, Regina O'Keefe and William Watts, he failed to copy Mr. Steiker on that email. For her part, Ms. O'Keefe did not respond to this message until more than two years later when she was conducting an audit for that year at which time she asked that Mr. Steiker confirm that the information that he had given to Mr. Panzarella was correct. Mr. Steiker agreed that the

information was correct with the exception of the price to be paid for the stock which, he noted, should have been the subject of an updated valuation as of the dates of the actual transactions and a "bring-down letter."

Obviously, there were a number of serious mistakes that were made in this case – by Mr. Panzarella, by Ms. O'Keefe and by both Mr. Finnegan and Mr. Ziegler who, despite also being Trustees of the ESOP, remarkably undertook absolutely NO investigation into the price which the ESOP was to pay for Mr. Panzarella's stock.[11] It has been noted that in enacting ERISA, Congress intended to provide the courts with broad remedies for redressing the interests of participants and beneficiaries when they have been adversely affected by breaches of a fiduciary duty. Donovan v. Bierwirth, 754 F.2d 1049, 1055 (2d Cir. 1985); Eaves v. Penn, 587 F.2d 453, 462 (10th Cir. 1978). One appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust

---

[11] To be sure, the prudent fiduciary standard requires that an investigation sufficient to determine if a prior appraisal constitutes a reasonable approximation of the fair market value of closely-held stock be conducted. See, e.g., Donovan v. Cunningham, 716 F.2d at 1473. Messrs. Finnegan and Ziegler, in contrast, conducted no investigation whatsoever into the fair market value of Mr. Panzarella's shares and made no apparent efforts to even educate themselves on their duties as ESOP Trustees until long after Mr. Panzarella retired from the company. That Mr. Finnegan and Mr. Ziegler thereby breached their fiduciary duties to the Cook ESOP is, we believe, self-evident. See also, Secretary, United States Department of Labor v. Kwasny, 853 F.3d 87, 91 (3d Cir. 2017)("Under ERISA, trustees of an ERISA retirement plan... have the following duties: (1) ensure that plan assets are held in a trust account, (2) act solely in the interest of the plan participants and their beneficiaries, (3) act prudently, (4) prevent the plan from engaging in a direct or indirect transfer of plan assets for the benefit or use of a party in interest, and (5) refrain from dealing with the plan's assets for the fiduciary's own interest. Breach of these duties results in a violation and may trigger restitution or injunctive relief.")

beneficiaries to the position they would have occupied but for
the breach of trust.  Donovan, 754 F.2d at 1056; Eaves, 587 F.2d
at 463; Glass Dimensions, Inc. v. State Street Bank & Trust Co.,
931 F. Supp. 2d 296, 307 (D. Mass. 2013).

While we cannot find that Mr. Panzarella necessarily acted
in bad faith given that he did seek advice from his legal and
accounting advisors, we also cannot find that he acted wholly in
good faith either inasmuch as he was well aware of the financial
difficulties Cook was experiencing in 2012 and the necessary
impact such hardships would had to have had upon the valuation of
the company's stock.  We therefore conclude that, in view of all
of the foregoing and because the Cook stock as of March - May,
2012 has never been valued, the most appropriate remedy is that
of rescission/restitution.  See, e.g., 29 U.S.C. §1109(a).  See
also, Harris Trust and Savings Bank v. Salomon Smith Barney,
Inc., 530 U.S. 238, 253, 120 S. Ct. 2180, 2191, 147 L. Ed.2d 187
(2000)(recognizing that restitution against transferee of tainted
plan assets is appropriate equitable remedy under ERISA and that
"where statutory language provides a clear answer, it ends there
as well); Leckey v. Stefano, 501 F.3d 212, 231 (3d Cir.
2007)(holding that imposition of appropriate equitable remedy
under ERISA properly left to the District Court); Eaves v. Penn,
supra, (holding proper District Court's conclusion that
rescission of purchase-sale agreement to restore plan's original

liquid assets is remedy most likely to protect participants and effectuate original purposes of profit-sharing plan); <u>Gilliam v. Edwards</u>, 492 F. Supp. 1255, 1266 (D.N.J. 1980)(noting that Section 409(a) grants courts wide discretion in fashioning legal and equitable relief to make plan whole and protect beneficiaries' rights including rescission of unlawful transactions).

Accordingly, we shall direct that Mr. Panzarella effectively "reverse" the prohibited transaction by repaying the ESOP the $312,240.00 which he received for the sale of his 3,000 shares and that those 3,000 shares of Cook Technologies' stock be returned to him.

There now remains the matter of the pension and other benefits due and owing to Mr. Panzarella that have never been paid, ostensibly because of the prohibited transaction. The Cook parties assert that under Section 206(d)(4), 29 U.S.C. §1056(d)(4), they were permitted to withhold the benefits due Mr. Panzarella under the Plan on advice of counsel and to offset the damages resulting from his ERISA violations.

Section 206(d) contains two provisions which are significant here. First, §206(d)(1) states the general rule that "Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated." As claimed by the Cook parties, §206(d)(4) outlines certain exceptions to the general

proscription on assignment/alienation as follows, *inter alia,*[12]

in relevant part:

> (4) Paragraph (1) shall not apply to any offset of a
> participant's benefits provided under an employee pension
> benefit plan against an amount that the participant is
> ordered or required to pay to the plan if -
>
>> (A) the order or requirement to pay arises -
>>
>>> (I) under a judgment of conviction for a crime
>>> involving such plan,
>>>
>>> (ii) under a civil judgment (including a consent
>>> order or decree) entered by a court in an action
>>> brought in connection with a violation (or alleged
>>> violation) of part 4 of this subtitle [29 U.S.C.
>>> §1101 et. seq.], or
>>>
>>> (iii) pursuant to a settlement agreement between
>>> the Secretary and the participant, or a settlement
>>> agreement between the Pension Benefit Guaranty
>>> Corporation and the participant, in connection
>>> with a violation (or alleged violation) of part 4
>>> of this subtitle [29 U.S.C. §1101 et. seq.] by a
>>> fiduciary or any other person.
>>
>> (B) the judgment, order, decree, or settlement
>> agreement expressly provides for the offset of all or
>> part of the amount ordered or required to be paid to
>> the plan against the participant's benefits provided
>> under the plan, ...

In considering the interplay between Sections

409(a)(mandating that a person who breaches his or her duties to

a pension fund shall be personally liable to make good to such

plan any losses to the plan resulting from the breach) and

206(d)(1) and taking note of the legislative history of Section

---

[12] Additional exceptions are provided in the statute for qualified
domestic relations orders and a voluntary and revocable assignment not to
exceed 10 percent of any benefit payment.  See, 29 U.S.C. §1056(d)(2), (3).

206(d)(1) and its discussion of "a garnishment or levy," as
opposed to an "attachment,"[13] the Third Circuit has held that
§206(d)(1) does not operate to foreclose a set-off of benefits
due to "fiduciaries who breach their fiduciary duties to a
pension fund and thereby cause it losses." Coar v. Kazimir, 990
F.2d 1413, 1424 (3d Cir. 1993). Thus, in appropriate
circumstances such as those delineated in Section 206(d)(4), an
offset of benefits otherwise due to a fiduciary who has harmed a
Plan by and through a breach of the fiduciary duties he owes to
that Plan may be warranted. Martorana v. Board of Trustees of
Steamfitters Local 420, 404 F.3d 797, 804 (3d Cir. 2005).

    In this case, however, although Mr. Panzarella may have
breached the fiduciary duties which he owed to the Cook ESOP by
selling his stock at an outdated price, his breach was the result
of his mis-understanding of Mr. Steiker's sought-after advice and
was thus the consequence of negligence - not intentional or
malicious deceit. And, as we noted earlier, he was not the sole
Trustee of the Plan. Given that Mr. Ziegler and Mr. Finnegan

---

[13] As stated by the Court in Coar, "'garnishment' or 'alienation'
refer[] to actions by third parties, such as a beneficiary's employer or
creditors, and not as recoupment by the pension plan." 990 F.2d at 1422.
Stated otherwise, while

    "garnishment is but a form of attachment, ... attachment and garnishment
    differ in character in that attachment is directed against property of
    the principal defendant which is in his possession or under his control,
    while the object of garnishment is to reach an indebtedness due to the
    principal defendant by a *third* person, or property in the possession or
    control of a third person, which belongs to the principal defendant."

Coar, at 1421 (citing 7 C.J.S. *Attachment* §2 (1980).

were equally negligent in this regard, we cannot find that the purposes of ERISA are in any way served by withholding from Mr. Panzarella the benefits to which he was clearly entitled after nearly 37 years of employment at Cook Technologies. We shall therefore direct that Mr. Panzarella promptly be paid all of those benefits which accrued and are still due and owing to him under and from the ESOP.

   B. *Rico Claims*

   In their Counterclaim to Panzarella's counter-suit in Case No. 15-3568, the Cook Parties raise three claims against Thomas Panzarella under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1962(b), (c), and (d) ("RICO"), ostensibly arising out of Mr. Panzarella's having misled Cook Technologies' bank regarding Cook's financial condition and the value of its inventory, having engaged in the prohibited transactions at issue and in his handling of Freedom Sciences and its sale to Harmar by allegedly diverting funds from the sale of Freedom Sciences away from Cook and to himself and his son.

   Civil remedies for RICO violations are authorized under Section §1964, subsection (c) of which permits "[a]ny person injured in his business or property by reason of a violation of section 1962" to "sue therefor in any appropriate United States district court ..." 18 U.S.C. §1964(c). Subsections (b), (c), and (d) of RICO Section 1962 invoked by the Cook parties, provide

50

as follows in relevant part:

.....

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

Pursuant to 18 U.S.C. §1961, "person," "enterprise,"

"racketeering activity," and "pattern of racketeering activity,"

are defined in pertinent part as meaning:

(1) "racketeering activity" means ... (B) any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1341 [18 U.S.C. §1341](relating to mail fraud), section 664 [18 U.S.C. §664](relating to embezzlement from pension and welfare funds) ..., section 1343 [18 U.S.C. §1343](relating to wire fraud),...

...

(3) "person" includes any individual or entity capable of holding a legal or beneficial interest in property;

(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after

51

the effective date of this chapter and the last of which
occurred within ten years (excluding any period of
imprisonment) after the commission of a prior act of
racketeering activity;

...

"An enterprise must be an 'entity separate and apart from the pattern of racketeering activity in which it engages,'" and "can be proven 'by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" Flood v. Makowski, Civ. A. No. 3:CV-03-1803, 2004 U.S. Dist. LEXIS 16957 at *20 - *21 (M.D. Pa. Aug. 24, 2004)(quoting United States v. Turkette, 452 U.S. 576, 583, 101 S. Ct. 2524, 2529, 69 L. Ed. 2d 246 (1981)). *In accord,* Boyle v. United States, 556 U.S. 938, 947, 129 S. Ct. 2237, 2244, 173 L. Ed.2d 1265 (2009)("the existence of an enterprise is an element distinct from the pattern of racketeering activity and proof of one does not necessarily establish the other," although "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise may in particular cases coalesce"). To be an association-in-fact enterprise requires "three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle, supra.

Proving a pattern of racketeering activity, in turn,

"requires plaintiffs to show 'that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity.'" Germinaro v. Fidelity National Title Insurance Co., No. 17-1640, 737 Fed. Appx. 96, 102 2018 U.S. App. LEXIS 15955 (3d Cir. June 14, 2018)(quoting United States v. Bergrin, 650 F.3d 257, 267 (3d Cir. 2011)). "Predicate acts are related if evidence demonstrates 'that the criminal activities have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Id.(quoting Bergrin, supra, and H.J., Inc. v. New Bell Telephone Co., 492 U.S. 229, 240, 109 S. Ct. 2893, 106 L. Ed.2d 195 (1989)).

Continued criminal activity, otherwise known as "continuity" may arise either where there is "a closed period of repeated conduct" or "past conduct that by its nature projects into the future with a threat of repetition." H.J., 492 U.S. at 241, 109 S. Ct. at 2902. Accordingly, "closed-ended continuity" "can be established 'by proving a series of related predicates extending over a substantial period of time,'" and "open-ended continuity" can "be established by proving a threat of continuity, which exists where the predicate acts themselves involve threats of long-term racketeering activity, or where the predicate acts are part of an entity's regular way of doing business." H.J., and

Germinaro, both supra; United States v. Pelullo, 864 F.2d 193, 208 (3d Cir. 1992).  Thus, "[w]hether the predicate acts constitute a threat of continued racketeering activity depends on the facts of each case" with the result that "where it is shown that the predicates are a regular way of conducting a defendant's ongoing legitimate business or of conducting or participating in an ongoing and legitimate RICO enterprise," the continuity element may be satisfied.  Tabas v. Tabas, 47 F.3d 1280, 1295 (3d Cir. 1995)(quoting H.J., 492 U.S. at 243, 109 S. Ct. at 2902).

To obtain civil relief under §1962(b), a plaintiff must establish that the defendant had an interest in or control of any enterprise which affects interstate or foreign commerce and that a specific nexus existed between control of a named enterprise and the alleged racketeering activity.  Kehr Packages v. Fidelcor, Inc., 926 F.2d 1406, 1411 (3d Cir. 1991); Greenberg v. Tomlin, 816 F. Supp. 1039, 1047 (E.D. Pa. 1993).  A violation of §1962(c) requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  Sedima. S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L. Ed.2d 346 (1985).  "If a defendant engages in a pattern of racketeering activity in a manner forbidden by [the] provisions [of Section 1961(1)], and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under §1964(c)."  Id, 473 U.S. at 495, 105 S. Ct. at 3284.

Finally, liability for a RICO conspiracy under §1962(d) "may be found where the conspirator intended to 'further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.'" United States v. Fattah, 902 F. 3d 197, 247 (3d Cir. 2018)(quoting Salinas v. United States, 522 U.S. 52, 65, 118 S. Ct. 469, 139 L. Ed.2d 352 (1997)). Where, for example, the substantive criminal offense is alleged to be the conducting of a §1962(c) enterprise, it must be shown that (1) two or more persons agreed to conduct or to participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity; (2) that the defendant was a party to or member of that agreement; and (3) that the defendant joined the agreement or conspiracy knowing of its objective to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity. Id.

In this case, the Cook parties allege that Thomas Panzarella committed "multiple related illegal acts," only three of which – mail fraud in violation of 18 U.S.C. §1341, wire fraud in violation of 18 U.S.C. §1343, and theft or embezzlement from employee benefit plan in violation of 18 U.S.C. §664, are predicate acts under Section 1961(1). These crimes are defined

as follows:

### §664.  Theft or embezzlement from employee benefit plan

Any person who embezzles, steals, or unlawfully and
willfully abstracts or converts to his own use or to the use
of another, any of the moneys, funds, securities, premiums,
credits, property, or other assets of any employee welfare
benefit plan or employee pension benefit plan, or of any
fund connected therewith, shall be fined under this title,
or imprisoned not more than five years, or both.

### §1341.  Frauds and swindles

Whoever, having devised or intending to devise any scheme or
artifice to defraud, or for obtaining money or property by
means of false or fraudulent pretenses, representations, or
promises, or to sell, dispose of, loan, exchange, alter,
give away, distribute, supply, or furnish or procure for
unlawful use any counterfeit or spurious coin, obligation,
security, or other article, or anything represented to be or
intimated or held out to be such counterfeit or spurious
article, for the purpose of executing such scheme or
artifice or attempting so to do, places in any post office
or authorized depository for mail matter, any matter or
thing whatever to be sent or delivered by the Postal
Service, or deposits or causes to be deposited any matter or
thing whatever to be sent or delivered by any private or
commercial interstate carrier, or takes or receives
therefrom, any such matter or thing, or knowingly causes to
be delivered by mail or such carrier according to the
direction thereon, or at the place at which it is directed
to be delivered by the person to whom it is addressed, any
such matter or thing, shall be fined under this title or
imprisoned not more than 20 years, or both.  If the
violation occurs in relation to, or involving any benefit
authorized, transported, transmitted, transferred,
disbursed, or paid in connection with, a presidentially
declared major disaster or emergency ... , or affects a
financial institution, such person shall be fined not more
than $1,000,000 or imprisoned not more than 30 years, or
both.

### §1343.  Fraud by wire, radio, or television

Whoever, having devised or intending to devise any scheme or
artifice to defraud, or for obtaining money or property by
means of false or fraudulent pretenses, representations, or

promises, transmits or causes to be transmitted by means of
wire, radio, or television communication in interstate or
foreign commerce, any writings, signs, signals, pictures, or
sounds for the purpose of executing such scheme or artifice,
shall be fined under this title or imprisoned not more than
20 years, or both.  If the violation occurs in relation to,
or involving any benefit authorized, transported,
transmitted, transferred, disbursed, or paid in connection
with, a presidentially declared major disaster or emergency,
... or affects a financial institution, such person shall be
fined not more than $1,000,000 or imprisoned not more than
30 years, or both.

Central to making out a cause of action based upon each of
these three offenses is the necessity of showing that the
defendant acted with the intent to defraud.  See, e.g., United
States v. Ferriero, 866 F.3d 107, 120 (3d Cir. 2017)("express
falsehoods lie at fraud's core"); United States v. Murray, 468
Fed. Appx. 104, 109 (3d Cir. March 8, 2012)(defendant held
properly convicted of wire fraud as scheme to defraud need not
come to fruition so long as defendant had intent to defraud);
United States v. Andrade, 788 F.2d 521, 527 (8th Cir.
1986)("essential element to establishing substantive fraud counts
is a showing that [defendants] acted with intent to defraud");
United States v. Rodolitz, 786 F.2d 77, 80 (2d Cir. 1986)("proof
of a fraudulent scheme requires evidence showing a specific
intent to defraud"); United States v. Pearlstein, 576 F.2d 531,
537 (3d Cir. 1978)("under mail fraud statute, it must be shown
that defendants possessed the requisite intent to defraud");
United States v. Felice, 481 F. Supp. 79, 90 (N.D. Ohio 1978).

Here, the gist of Cook's RICO claims is that Panzarella,

through the use of regular mail, email and other forms of
electronic transmissions, intentionally misled Univest bank
regarding Cook's financial condition and the value of its
inventory, diverted loan proceeds intended for Cook to Freedom
Sciences, improperly obtained ownership interests for himself and
his son in Freedom Sciences without paying any consideration
therefor and depleted Cook's funds and available credit by paying
Freedom Sciences' operating and other expenses.  The Court notes
that while the Cook parties may have endeavored to make out these
assertions at trial, the evidence which they presented fell far
short – it was both inadequate and incredible.  To be sure, as to
Cook's first contention, the only real evidence produced was one
email in which Mr. Panzarella references concern about the amount
of Cook's inventory and the potential effect which a drop in that
inventory figure could have on the company's position with its
lender.  Even putting aside for the moment that one incident does
not make out the requisite pattern of racketeering activity,
there simply is no evidence whatsoever that Panzarella was doing
anything other than expressing concern about the status of Cook's
inventory and alerting the company's controller that there could
be a potential problem on the horizon.  (Exhibit P-48).  On this
issue, Mr. Panzarella testified credibly and repeatedly and we
cannot find that his testimony was refuted.

Similarly, as to the matter of their ownership interests in

Freedom Sciences, the record evinces that both Thomas Panzarella, Sr. and Thomas Panzarella, Jr. performed extensive services on behalf of Freedom Sciences by, *inter alia*, creating the ATRS technology and writing computer codes and grant applications, attending trade shows and securing funding from outside investors and government sources. In so doing, the Panzarellas effectively earned their ownership interests in Freedom Sciences through "sweat equity" in lieu of making monetary capital contributions to the entity. Insofar as we know of nothing improper or untoward in acquiring ownership through the contribution of work in lieu of money, we do not find that the Panzarellas' interests in Freedom Sciences were acquired through a pattern of racketeering activity.

Finally, Cook Technologies' investment in Freedom Sciences occurred largely through in-kind, non-cash contributions, the assumption of debt in the amount of $3.685 million and the purchase by Freedom Sciences of certain property and equipment, inventory and intangible assets with a value of $552,000 for $5.5 million from Cook Technologies. Although the debt was eventually transferred back to Cook's books to make Freedom Sciences more saleable, the record evinces that Cook received a corresponding increase in equity in return. In short, there is no evidence on this record to support the Cook parties' claim that Freedom Sciences' operating expenses were paid without appropriate

remuneration being given to Cook in return.

Likewise, there is no evidence that Mr. Panzarella in any way intended to defraud or mislead Cook or anyone else or that he conspired with anyone, including his son, to accomplish this objective. While in hindsight Mr. Panzarella could certainly have made better decisions with respect to the merger with Advent, functioning as the chief executive officer for Cook and Freedom Sciences simultaneously, the sale of Freedom Sciences to Harmar and in his succession planning at Cook, there is absolutely no evidence of any malice or ill-will on Panzarella's part at the time that these decisions were made and nothing to suggest that they were made in anything other than good faith. Likewise, while the sale of his outside-the-plan stock at the $104 per share value was obviously improper, it is clear from the record that it was the result of Panzarella's misunderstanding of Mr. Steiker's legal advice and not the result of racketeering activity. Accordingly, we cannot find that the Cook Plaintiffs have made out *any* of the elements required to sustain a RICO cause of action under Sections 1962(b), (c), or (d) and judgment shall therefore be entered in favor of Thomas Panzarella on Counts I, II, and III of the Counterclaim in Case No. 15-CV-3568.

### C. *Cook's Common Law Breach of Fiduciary Duty Claims*

In Counts IV and V of its Counterclaim in <u>Panzarella v. Cook</u>

60

Technologies, Inc., et. al., No. 15-CV-3568, the Cook parties assert two claims under Pennsylvania common law for breach of fiduciary duty against Thomas Panzarella.  In Count IV, Cook avers that by identifying an opportunity in the assisted-mobility products marketplace and forming Freedom Sciences, Mr. Panzarella breached the duty of loyalty which he owed to Cook by funneling opportunities to Freedom Sciences that were within the scope of Cook Technologies' business.  In Count V, it is alleged that Mr. Panzarella engaged in a pattern of self-dealing in breach of his duty of loyalty to Cook by using Cook's employees to perform wiring, repairs and renovations to his house while these employees were paid by Cook, using Cook's funds for personal expenses, including personal vacations, using Cook's funds to employ family members when such employment was not in Cook's best interests, and by using Cook's funds to support his other business opportunities.

It is a well-established principle of Pennsylvania law that officers and directors of a corporation are deemed to stand in a fiduciary relation to the corporation.  Seaboard Industries, Inc. v. Monaco, 442 Pa. 256, 261, 276 A.2d 305, 308 (1970).  Under this fiduciary standard, "there is demanded of the officer or director of a corporation that he furnish to it his undivided loyalty; if there is presented to him a business opportunity which is within the scope of its own activities and of present or

potential advantage to it, the law will not permit him to seize the opportunity for himself. ..." Id, 276 A. 2d at 309 (quoting, *inter alia*, Lutherland, Inc. v. Dahlen, 357 Pa. 143, 151, 53 A.2d 143, 147 (1947) and Bailey v. Jacobs, 325 Pa. 187, 194, 189 A. 320, 324 (1937)); Ciampa v. Conversion Sciences, Inc., 135 A.3d 652 (Pa. Super. 2015).  Stated otherwise, "[t]he duty of loyalty under Pennsylvania law requires that corporate officers devote themselves to the corporate affairs with a view to promote the common interests and not their own." Estate of Lemington for the Aged v. Baldwin, 777 F.3d 630, 636 (3d Cir. 2015).

However, "[w]here the corporation is *unable* to avail itself of the business opportunity, there can be no usurpation of a corporate opportunity." Robinson v. Brier, 412 Pa. 255, 257, 194 A.2d 204, 206 (1963).  Thus, an officer or director may seize a corporate opportunity if the same is made known to the shareholders who consent to the acquisition of the opportunity by the individual officer or director instead of the corporation, and such action is not detrimental to the creditors of the corporation.  CST, Inc. v. Mark, 360 Pa. Super. 303, 308, 520 A.2d 469, 471 (1987).  "Whether a business opportunity is a 'corporate' opportunity is a question of fact to be determined from the circumstances existing at the time when it arose," but is generally acknowledged as belonging to the corporation if the corporation is in the same or related business as is the subject

matter of the opportunity.  Id; Tyler v. O'Neill, 994 F. Supp. 603, 612 (E.D. Pa. 1998).  The test of liability is whether the officer or director has been unjustly enriched by their actions. InfoSAGE, Inc. v. Mellon Ventures, L.P., 2006 PA Super 68, 896 A.2d 616, 637 (2006); Tyler, supra.  A showing of unjust enrichment, of course, requires a demonstration that: (1) a benefit was conferred on the defendant; (2) the defendant retained that benefit; and (3) it would be inequitable for the defendant to retain the benefit without paying full value for it. Lampe v. Lampe, 665 F.3d 506, 520 (3d Cir. 2011)(citing Schenck v. K.E. David, Ltd., 446 Pa. Super. 94, 666 A.2d 327, 328 (1995).

In this case, although Cook Technologies had been producing some assisted mobility products for another company, some parts of which had been designed by Thomas Panzarella, Cook's primary business was manufacturing and production - not engineering technology and design.  The evidence produced at trial evinces that although Cook essentially "incubated" Freedom Sciences, it could only go so far in growing and developing the ATRS technology.  Both Thomas Panzarella, Sr. and Thomas Panzarella, Jr. testified without contradiction by any other witness that in order to obtain grant monies and secure funding from government and other outside sources, it was necessary to set Freedom Sciences up as a separate entity – they couldn't obtain grants or financing if the technology was being developed by Cook, which

63

was an established, older manufacturing business. And, while there is no doubt that both Panzarellas were ultimately benefitted and enriched by the creation and eventual sale of Freedom Sciences, it clearly appears from Cook's financial statements and other records that Cook also reaped significant benefits from its exclusive manufacturing arrangement with Freedom Sciences. Accordingly, we cannot find that Thomas Panzarella usurped Cook's corporate opportunity or that he breached the fiduciary duties which he owed to Cook in forming Freedom Sciences. Nor can we find that Panzarella was unjustly enriched at Cook's expense, given the amount of time and work which he expended on the development of the ATRS, in securing grant monies and other funding to support that development and in the marketing and sale of Freedom Sciences' products, all of which were manufactured by Cook. For these reasons, judgment shall therefore be entered in Panzarella's favor on Count IV of the Counterclaim.

Judgment shall likewise be entered in favor of Panzarella with respect to the fifth and final count of Cook's counterclaim. Again, Cook's claims are that Panzarella breached his fiduciary duties to Cook by using its employees to perform wiring, repairs and renovations to his home, paying his personal expenses with Cook's funds, including his personal vacations and employing his family members at Cook when such employment was not in Cook's

best interests.  Simply stated, there is no evidentiary support

whatsoever for these allegations and no basis upon which to

afford Cook any relief in Count V.[14]

### D. *Thomas Panzarella's Breach of Contract Claims*

As noted above, in both his Complaint in Case. No. 15-3568

and in his Counterclaim in Case No. 15-1028, Thomas Panzarella

seeks damages under Pennsylvania common law for Cook's purported

breaches of the following contracts: (1) the Note securing

Panzarella's loan to the company in the principal amount of

$208,160 dated July 26, 2012; (2) his Salary Continuation

Agreement dated June 1, 2012; and (3) his Stock Purchase

Redemption Agreement entered into on December 21, 1990.

It is axiomatic that to make out a cause of action for

breach of contract under the law of Pennsylvania, the following

elements must be proven: (1) the existence of a contract,

---

[14] The Court does take note of Panzarella's assertion that the applicable Statutes of Limitations bar the RICO and common law breach of fiduciary duty claims against him, given that all of the alleged racketeering and other activities took place prior to his retirement in June 2012. Panzarella's motion to dismiss these claims was denied to afford the Cook parties the opportunity to develop a record on what, if anything, prevented them from discovering these alleged activities in a timely manner.  While there was some argument, there was no evidence presented at trial and the necessary showing was not made.  Hence, while we have considered the merits of these claims in this Decision in the interests of being thorough, we are nevertheless constrained to conclude that they are, in fact, time-barred. See, Agency Holding Corp. v. Malley-Duff & Associates, 483 U.S. 143, 107 S. Ct. 2759, 97 L. Ed.2d 121 (1987)(holding that four-year statute of limitations applicable to Clayton Act civil enforcement actions applies in RICO civil enforcement cases); Forbes v. Eagleson, 228 F.3d 471, 483-484 (3d Cir. 2000)(holding that accrual of civil claims under RICO governed by injury discovery rule whereby court must ascertain when plaintiffs knew or should have known of their injury with plaintiffs bearing burden of proving fraudulent concealment sufficient to warrant equitable tolling); 42 Pa. C. S. §5524.

including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. <u>Ware v. Rodale Press, Inc.</u>, 322 F.3d 218, 225 (3d Cir. 2003); <u>Republic Services of Pennsylvania, LLC v. Caribbean Operators, LLC</u>, 301 F. Supp. 3d 468, 476 (E.D. Pa. 2018). "To prove damages, a plaintiff must give a factfinder evidence from which damages may be calculated to a 'reasonable certainty.'" <u>Ware</u>, at 226 (quoting <u>ATACS Corp. v. Trans World Communications, Inc.</u>, 155 F.3d 659, 668 (3d Cir. 1998). "At a minimum, reasonable certainty embraces a rough calculation that is not 'too speculative, vague or contingent upon some unknown factor.'" <u>Id</u>.

Turning first to the Demand Note, the essential terms are straight-forward and the Note provides as follows in pertinent part:

> ON DEMAND, the undersigned ("Borrower"), promises to pay to the order of Thomas A. Panzarella, Sr. ("Lender"), the principal sum of Two Hundred and Eight Thousand One Hundred and Sixty and 00/100 Dollars ($208,160.00), with interest on the unpaid balance at the current mid-term applicable federal rate of 1.93% per annum. Interest shall accrue effective retroactive from July 26, 2012 and be payable, together with principal, in a single lump sum payment, on Demand. ...

> The Company agrees to pay all costs, charges and expenses incurred by the Lender (including, without limitation, costs of collection, court costs, and reasonable attorneys' fees and disbursements) in connection with the enforcement of the Lender's rights under this Note (all such costs, charges and expenses being herein referred to as ("**Costs**"). The Company agrees that any delay on the part of the Lender in exercising any rights hereunder will not operate as a waiver of such rights, and further agrees that any payments received hereunder will be applied first to

66

Costs, then to interest and the balance to principal.  The
Lender shall not by any act, delay, omission, or otherwise
be deemed to waive any of its rights or remedies, and no
waiver of any kind shall be valid unless in writing and
signed by the Lender.  Presentment for payment, demand,
protest, notice of protest and notice of nonpayment are
hereby waived.  Irrespective of any claim, defense, credit
or offset the Company may have against the Lender; these
shall not discharge or modify the Company's absolute,
independent obligation to repay the Lender any sums advanced
to the Company pursuant to this Note. ...

(Exhibit Panzarella 19).

There is no dispute that Cook has paid no money whatsoever

to Mr. Panzarella in repayment of the $208,160 principal amount

of this loan, nor has it made any interest payments either.

According to Messrs. Kulp and Ziegler, no monies have been paid

on the advice of their current legal and ERISA counsel and

because Cook does not have the money to pay Mr. Panzarella back.

As the Note itself makes clear, "[i]rrespective of any claim,

defense, credit or offset the Company may have against the

Lender, these shall not discharge or modify the Company's

absolute, independent obligation to repay the Lender any sums

advanced to the Company pursuant to this Note."  It is therefore

apparent that the Cook parties are in breach of the contractual

undertakings to which they agreed in the terms of this Note, and

that Mr. Panzarella is entitled to repayment of the principal

amount in full, *to wit,* $208,160, together with accrued interest

at the rate of 1.93% per annum from July 26, 2012 and that he is

likewise entitled to recoupment of the attorneys' fees, costs and

other expenses which he has incurred to secure re-payment.

In the Salary Continuation/Non-Competition Agreement which Thomas Panzarella entered into with Cook Technologies, the parties agreed to, *inter alia*, the following terms and conditions, in relevant part:

1. <u>Salary Continuation</u>.  Beginning with the pay period starting June 4, 2012, through the pay period ending June 9, 2013, Panzarella shall receive, as a salary continuation benefit for continuing business development services $50,000,00, payable weekly, net of insurance co-pays as a 1099 payment.

2. <u>Benefits/Fringes</u>.  In addition to the salary continuation provided in 1 above, the Company will:

   a.  Continue Panzarella and spouse's health and dental insurance coverage, at current levels of coverage and employer contribution, subject however to plan changes in premiums and employer contribution rates which may occur with respect to the Company sponsored group plan, through the pay period ended December 30, 2012;

   b.  On June 1, 2013, at which time the Company provided automobile insurance will be cancelled, execute and deliver to Panzarella the title to the Company owned automobile which is currently provided for his use, for no consideration, but at the deemed taxable value as determined by market value at that time;

   c.  Convert his earned vacation time totaling 764 hours (calculated to be the sum of $73,464.42 using his most recent unreduced base salary), into a note payable from the Company to be repaid beginning July 1st, 2012 at the rate of $1,155.33 per month;

   d.  Continue the Company owned term life insurance on Panzarella's life, at Company expense, through the pay period ended June 1, 2012 and thereafter, if available, transfer ownership to Panzarella the Company owned term life insurance policy on his

life, provided that Panzarella arranges for such transfer and pays any fee, assessment or charge associated with such transfer on or before June 1, 2013; and

e.  Continue the Company owned Individual Long Term Disability insurance coverage on Panzarella, at Company expense, through the pay period ended June 1, 2013.

3.  Noncompetition.  During the time this Agreement is in effect Panzarella, shall not, directly or indirectly, acting alone or in conjunction with others:

(a) Engage as a director, officer, employee, partner, employee, shareholder, or in any other capacity, in any business in competition with any business then being conducted by the Company;

(b) Request any customers of any business then being conducted by the Company to curtail or cancel their business with the Company;

(c) Disclose to any person, firm or corporation any trade, technical or technological secrets, any details of organization or business affairs, any names of past or present customers of the Company or any other information relating to the business of the Company;

(d) Solicit, canvass or accept any business or transaction for any other person, firm, or corporation or business similar to any business of the Company;

(e) Induce, or attempt to influence, any consultant of the Company to terminate employment with the Company or to enter into any employment or other business relationship with any other person (including Panzarella), firm or corporation; or

(f) Act or conduct himself in any manner which he shall reason to believe is inimical or contrary to the best interests of the Company.

Panzarella recognizes that immediate and irreparable damage will result to the Company if he breaches any of the terms and conditions of this Section 2 and, accordingly, Panzarella hereby consents to the entry by any court of competent jurisdiction of an injunction against him to

restrain any such breach, in addition to any other remedies or claims for money damages which the Company may seek.

4. <u>Waiver of Right to Participate</u>. Notwithstanding the provisions of this Agreement and the severance payments to be made to Panzarella hereunder, Panzarella's full time employment by the Company, accrual of vacation time and sick days and his participation in the Company sponsored Employee Stock Ownership Plan and 401(k) Plan, shall be deemed to have terminated June 1, 2012, and Panzarella waives further participation in such plans from and after June 1, 2012.

     ...

(Exhibit P-16.)

It appears that Cook did pay Panzarella his $1,000 weekly salary for the one-year contract period and his attendant expenses but failed to make more than two payments in the amount of $1,155.33 in payment of the balance of his unused vacation time and failed to reimburse him for his having paid off the company-provided vehicle in the amount of $6,788.35. (Exhibits P-139; P-140; Panzarella 17; Panzarella 47). The Cook parties do not dispute this. Given the clarity of the terms of the Salary Continuation Agreement, we find that Cook is in breach by failing to pay Panzarella all of the monies to which he is entitled thereunder and hence judgment in Panzarella's favor is warranted in the amount of $77,942.11.

Thomas Panzarella next submits that the Cook parties have breached the Redemption Agreement of December 21, 1990 under which Cook was required to purchase all of his individually, outside-the-plan stock upon his retirement from the company,

"... at the fair market value as of the end of the Company's fiscal year immediately preceding the Shareholder's death or termination of employment as the case may be, as determined by the independent third party appraiser retained or engaged by the Company to value its stock for purposes of the Company Employee Stock Ownership Plan." (Exhibit Panzarella 9, ¶s 3, 4). However, the Redemption Agreement upon which Mr. Panzarella relies in support of this breach of contract claim was superceded by the Stockholder Agreement which he entered into with the Company, along with Messrs. Kulp and Ziegler, on February 14, 2012. (Exhibit Panzarella 10). Again under this Stockholder Agreement, Cook had a 60-day option to buy all of Mr. Panzarella's stock upon his retirement; if this option were not exercised within that time-frame, Mr. Panzarella was thereafter free to make any "Voluntary Lifetime Transfer" to an outside individual(s) provided that notice of the identity, address, and business or occupation of that outside offeree be disclosed to the Company. In that event, the Company would again have sixty days within which to elect to buy all of the offered stock and, if it again declined to exercise its option to buy, the Lifetime Transfer could be consummated. Here, no showing has been made that Mr. Panzarella gave the required notice of the identity of an outside offeree to whom he wished to transfer his Cook stock. Accordingly, we cannot find any breach here and judgment is

properly entered in favor of the Cook parties as to this claim.

   E. *Panzarella's Claims Under Pennsylvania's Wage Payment*
      *and Collection Law*

In the final two counts of his Complaint in Case No. 15-CV-3568, Thomas Panzarella seeks to recover unpaid fringe benefits and other statutory damages from both Cook Technologies and Michael Finnegan, Gordon Kulp and Robert Ziegler individually under the Pennsylvania Wage Payment and Collection Law, 43 P.S. §260.1, *et. seq.* ("WPCL").

It has been observed that "Pennsylvania enacted the WPCL to provide a vehicle for employees to enforce payment of their wages and compensation withheld by their employers." Oberneder v. Link Computer Corp., 449 Pa. Super. 528, 674 A.2d 720, 721 (1996), *aff'd*, 548 Pa. 201, 696 A.2d 148 (Pa. 1997). "To present a wage-payment claim, the employee must aver a contractual entitlement to compensation from wages and a failure to pay that compensation." Braun v. Wal-Mart Stores, Inc., 2011 PA Super. 121, 24 A.3d 875, 954 (Pa. Super. 2011). In this regard, 43 P.S. §260.3 provides, in relevant part:

> (a) Wages other than fringe benefits and wage supplements.
> Every employer shall pay all wages, other than fringe
> benefits and wage supplements, due to his employees on
> regular paydays designated in advance by the employer.
> Overtime wages may be considered as wages earned and payable
> in the next succeeding pay period. All wages, other than
> fringe benefits and wage supplements, earned in any pay
> period shall be due and payable within the number of days
> after the expiration of said pay period as provided in a
> written contract of employment or, if not so specified,
> within the standard time lapse customary in the trade or

within 15 days from the end of such pay period. ...

(b) Fringe benefits and wage supplements. Every employer who by agreement deducts union dues from employee's pay or agrees to pay or provide fringe benefits or wage supplements, must remit the deductions or pay or provide the fringe benefits or wage supplements, as required, within 10 days after such payments are required to be made to the union in case of dues or to a trust or pooled fund, or within 10 days after such payments are required to be made directly to the employee, or within 60 days of the date when proper claim was filed by the employee in situations where no required time for payment is specified.

Under the following pertinent provisions of 43 P.S. §260.9a:

(a) Any employee or group of employees, labor organization or party to whom any type of wages is payable may institute actions provided under this act.

(b) Actions by an employee, labor organization, or party to whom any type of wages is payable to recover unpaid wages and liquidated damages may be maintained in any court of competent jurisdiction, by such labor organization, party to whom any type of wages is payable or any one or more employees for and in behalf of himself or themselves and other employees similarly situated, or such employee or employees may designate an agent or representative to maintain such action or on behalf of all employees similarly situated. Any such employee, labor organization, party, or his representative shall have the power to settle or adjust his claim for unpaid wages.

    ...

And finally, under §260.10,

Where wages remain unpaid for thirty days beyond the regularly scheduled payday, or, in the case where no regularly scheduled payday is applicable, for sixty days beyond the filing by the employee of a proper claim or for sixty days beyond the date of the agreement, award or other act making wages payable, or where shortages in the wage payments made exceed five percent (5%) of the gross wages payable on any two regularly scheduled paydays in the same calendar quarter, and no good faith contest or dispute of any wage claim including the good faith assertion of a right of set-off or counterclaim exists accounting for such non-

payment, the employee shall be entitled to claim, in addition, as liquidated damages an amount equal to twenty-five percent (25%) of the total amount of wages due, or five hundred dollars ($500), whichever is greater.

Thus, "[t]he WPCL does not create an employee's substantive right to compensation; rather, it only establishes a statutory vehicle to enforce payment of wages and compensation to which an employee is otherwise entitled by the terms of an agreement." Andrews v. Cross Atlantic Capital Partners, Inc., 2017 PA Super. 72, 158 A.3d 123, 133 (Pa. Super. 2017)(quoting Scungio Borst & Associates v. 410 Schurs Lane Development, LLC, 2015 PA Super. 260, 106 A.3d 103, 109 (Pa. Super. 2014)). "Therefore, the right to recover wages 'earned' by employees upon separation from employment under the WPCL is a statutory remedy which *supplements* rather than *supplants* a common law action for breach of contract." Id.(emphasis in original). Stated otherwise,

The WPCL is not only a vehicle for recovery of unpaid wages; *it also provides for damages in the event an employer withholds compensation in the absence of good faith.* Thus, if for instance an employer withholds wages based on a dispute with the employee that would result in a set-off, the employer's reliance on the set-off must be held in good faith. *Otherwise, the employee is entitled to additional, liquidated damages pursuant to the statute.*
(Emphasis in original)

Id., 153 A.3d at 134(quoting Thomas Jefferson University v. Wapner, 2006 PA Super 156, 903 A.2d 565, 574 (Pa. Super. 2006). "Good faith, under section 260.10, must be proven by clear and convincing evidence. Id.

As noted, Thomas Panzarella is endeavoring to recover from

both Cook Technologies and/or Michael Finnegan, Gordon Kulp and Robert Ziegler certain fringe benefits allegedly due and owing to him under the Salary Continuation/Non-competition Agreement which he and Cook entered into upon his June 1, 2012 retirement from the company.  Specifically, Mr. Panzarella seeks to enforce the terms of Paragraphs 2b and 2c of that Agreement which read:

> 2.  <u>Benefits/Fringes.</u>  In addition to the salary continuation provided in 1 above, the Company will:
>
> > ...
> >
> > b.  On June 1, 2013, at which time the Company provided automobile insurance will be cancelled, execute and deliver to Panzarella the title to the Company owned automobile which is currently provided for his use, for no consideration, but at the deemed taxable value as determined by market value at that time;
> >
> > c. Convert his earned vacation time totaling 764 hours (calculated to be the sum of $73,464.42 using his most recent unreduced base salary), into a note payable from the Company to be repaid beginning July 1st, 2012 at the rate of $1,155.33 per month;
> >
> > ...

These benefits clearly fall within the definition of "Fringe benefits or wage supplements" set forth in §260.2a of the WPCL as those include:

> all monetary employer payments to provide benefits under any employee benefit plan, as defined in section 3(3) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 et seq; as well as separation, vacation, holiday, or guaranteed pay; reimbursement for expenses; union dues withheld from the employees pay by the employer; and any other amount to be paid pursuant to an agreement to the employee, a third party or fund for the benefit of employees.

See generally, Scully v. US Wats, Inc., 238 F.3d 497, 517 (3d Cir. 2001)(Third Circuit "confident that the Pennsylvania Supreme Court would conclude that the stock option granted to [plaintiff] essentially a 'call option,' constitutes 'wages or compensation' within the meaning of the WPCL"). And "Employer" is defined in 43 P.S. §260.2a as including "every person, firm, partnership, association, corporation, receiver or other officer of a court of this Commonwealth and any agent or officer of any of the above-mentioned classes employing any person in this Commonwealth." Inasmuch as it is undisputed that Messrs. Kulp, Finnegan and Ziegler "were working on behalf of, or as agents of, the corporate defendant, they would be included within these definitions and subject to personal liability for violations of [the WPCL]." Accurso v. Infra-Red Services, 169 F. Supp. 3d 612, 617 (E.D. Pa. 2016); Tyler v. O'Neill, supra.

Here, the payment of the accrued vacation and conveyance of the title to the company-provided vehicle were terms negotiated into a binding one-year employment contract between Thomas Panzarella and Cook Technologies. See, Hartman v. Baker, 2000 PA Super 140, 766 A.2d 347, 353 (Pa. Super. 2000(citing Bowers v. NETI Technologies, Inc., 690 F. Supp. 349, 353 (E.D. Pa. 1988)). Cook does not dispute that it has made only two of the $1,155.33 monthly unused vacation payments and thus has not paid Panzarella in full for his earned vacation nor does it contest that it

failed to tender the title to the company-provided vehicle, a failure which Panzarella remedied by paying off the balance of the loan for the car himself. Inasmuch as Mr. Panzarella has thus established his claims under the WPCL, we find that he is entitled to damages in the amount of $71,153.76 for unpaid earned vacation time, and $6,788.35 for the company car.

To obtain statutory liquidated damages on the overdue amount, however, requires that there be no good faith contest or dispute of any wage claim including a good faith assertion that a right of set-off or counterclaim exists accounting for such non-payment. 43 P.S. §260.10. On this point, the evidence reflects that in similar fashion to Thomas Panzarella's many years of reliance upon his legal and accounting professionals, the Cook parties also followed the advice of their attorneys and ERISA counsel who erroneously informed them that they would be wise to forego paying Panzarella anything until after the matter of the "prohibited transaction" had been resolved. While hindsight now shows the ill-advised nature of this advice, it nevertheless suffices to provide Cook, Kulp, Finnegan and Ziegler an adequate "good faith" basis to relieve them of the WPCL's imposition of the 25% liquidated damages as a sanction for their decision.

In light of all of the foregoing, we now enter the following:

## **CONCLUSIONS OF LAW**

1.   This Court has jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1367 and 29 U.S.C. §1001, *et. seq*.

2.   Thomas Panzarella's sales in March, April and May of 2012 of 3,000 shares of his "outside-the-plan" stock in Cook Technologies at the per-share price of $104.08 to the Cook ESOP were prohibited transactions under Section 406 of ERISA, 29 U.S.C. §1106.

3.   The appropriate remedy for the undertaking of the prohibited transactions in this case is the restoration of the trust beneficiaries to the position they would have occupied had the transactions not taken place.  Accordingly, the Court shall hereby direct that the prohibited transactions be "reversed," and Mr. Panzarella shall be ordered to repay the Cook ESOP the $312,240.00 which he received for the sale of his 3,000 shares to the ESOP and that those 3,000 shares of Cook Technologies' stock be returned to him.

4.   The Cook parties did not have sufficient grounds to withhold the payment of Thomas Panzarella's retirement and pension benefits from him as an offset for the prohibited transactions.  Thomas Panzarella is therefore entitled to the prompt payment of any and all monies due and owing from both the cash investment and company stock portions of his retirement accounts from the Cook ESOP.  Those payments are appropriately

made in accordance with the terms and conditions of the Cook Employees Stock Option Plan (ESOP) applicable to payment of benefits in effect as of the date of Panzarella's retirement.

5.  The Cook Plaintiffs have failed to make out *any* of the elements required to sustain causes of action under RICO, 18 U.S.C. §§ 1962(b), (c), or (d) and have failed to make the requisite showing that equitable tolling of the RICO statute of limitations is warranted in this case.  Judgment is therefore properly entered in favor of Thomas Panzarella on Counts I, II, and III of the Counterclaim in Case No. 15-CV-3568.

6.  The Cook parties have failed to prove that Thomas Panzarella usurped Cook's corporate opportunity or breached the fiduciary duties which he owed to Cook in forming Freedom Sciences, nor have they proven that Panzarella was unjustly enriched at Cook's expense.  The Cook parties have also failed to demonstrate grounds for equitable tolling of the state statute of limitations for their common law breach of fiduciary duty claims against Thomas Panzarella.  For these reasons, judgment in Panzarella's favor is properly entered on Count IV of the Counterclaim in Case No. 15-CV-3568.

7.  There was no evidence whatsoever that Thomas Panzarella ever used Cook's employees to perform wiring, repairs and renovations to his home without having paid them personally or that any such work was performed during the time that such

employees were being paid to work for Cook, nor was there any evidence that Cook paid Panzarella's personal expenses with Cook's funds, or that Cook ever paid for Panzarella's personal vacations.  Finally, there was no evidence presented that Panzarella's family members were employed at Cook when such employment was not in Cook's best interests nor evidence upon which this Court could find that the statute of limitations is properly tolled.  There being no evidentiary support whatsoever for *any* of these allegations, judgment is also properly entered in favor of Panzarella and against Cook on Count V of Cook's counterclaim in Case No. 15-CV-3568.

8.  Cook breached its loan agreement with Thomas Panzarella by its failure and refusal to make any payments on the principal amount of $208,160 or any interest payments to be paid at the rate of 1.93%.  Thomas Panzarella is entitled to repayment of the principal amount in full, *to wit,* $208,160, together with accrued interest at the rate of 1.93% per annum from July 26, 2012 and is likewise entitled to recoupment of the attorneys' fees, costs and other expenses which he has incurred to secure re-payment.

9.  Cook also breached the Salary Continuation Agreement which it entered into with Thomas Panzarella on June 1, 2012 by failing to pay Panzarella for all of his accrued but unused vacation and by failing to tender to him the title to the company-provided vehicle which he had been driving.  Panzarella

is thus entitled to the entry of judgment in his favor in the amount of $77,942.11.

10. The Redemption Agreement which Thomas Panzarella and Cook entered into on or about December 21, 1990 under which Cook was required to purchase all of his individually, outside-the-plan stock upon his retirement from the company, was superceded by the Stockholder Agreement which he entered into with the Company, along with Messrs. Kulp and Ziegler, on February 14, 2012. Cook therefore did not breach the original Redemption Agreement and Thomas Panzarella is not entitled to any relief under the terms of that superceded Agreement.

11. By failing to pay Thomas Panzarella all of the fringe benefits to which it had agreed in the Salary Continuation Agreement, the Cook Technologies and its three officers and/or directors, Michael Finnegan, Gordon Kulp and Robert Ziegler violated the Pennsylvania Wage Payment Collection Law, although they reasonably believed in good faith that they had a valid reason for doing so. They are therefore properly held liable to Thomas Panzarella for the balance due and owing for his unpaid and unused vacation time ($71,153.76) and the amount which Panzarella personally paid to obtain the title for the company car ($6,788.35). Statutory, liquidated damages in the amount of 25% of the amount due and owing is not properly awarded.

An order follows.